**Haydee RUIZ, Plaintiff,**

v.

**Police Officer HERRERA, Police Sergeant Earley, Police Officer Krzeminski, Police Officer Monroe, Odel Jones, Barney Burden, and the Barney Burden Bailbond Company, Defendants.**

No. 89 Civ. 0535 (CSH).

United States District Court, S.D. New York.

Aug. 30, 1990.

---

David S.J. Neufeld, New York City, Gary A. Mastronardi, Bridgeport, Conn., for plaintiff.

George A. O'Hanlon, Port Chester, N.Y., for defendants: Herrera, Early, Krzeminski and Monroe.

Wofsey Rosen Kweskin & Kuriansky, Stamford, Conn. (Barney Burden, of counsel), for defendant Barney Burden.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Plaintiff Haydee Ruiz brings this action for false arrest pursuant to 42 U.S.C.

§ 1983 and under a theory of common law negligence. The case is before the Court on the motion for summary judgment of defendants Herrera, Earley, Krzeminski and Monroe, and on the motion to dismiss of defendant Burden.

## Background

Haydee Ruiz is a resident of Bridgeport, Connecticut. Ruiz Affidavit at ¶ 1.[1] On the evening of February 27, 1988, Ruiz and her husband, Israel Acevedo, drove to a night club called La Cascada located in Port Chester, New York. Ruiz ¶ 3; Acevedo ¶ 3. Ruiz and Acevedo arrived at approximately 11:00 p.m., locked their personal effects in the glove compartment of their car, and walked to La Cascada. Ruiz ¶ 3-4; Acevedo ¶ 3-4. In the night club, they met their friends and relatives, including Ruiz's sister, Olga Arroyo. Ruiz ¶ 5; Arroyo ¶ 3.

There are two accounts as to what happened next. Ruiz and her family remember the evening this way. Ruiz and her sister Arroyo went to the ladies room. They and another woman were in the bathroom when "[s]uddenly, the ladies room door burst open, and three or four Port Chester policemen entered the ladies room ... ordered [Arroyo] and the other lady to leave ... [and] told [Ruiz] that [she] was under arrest." Ruiz ¶ 7-8; Arroyo ¶ 5-6. Ruiz asked them why and was told there was an outstanding warrant for her arrest in Connecticut. Ruiz told them they were wrong. One of the officers held a photograph of a female fugitive in his hand and claimed that Ruiz was the woman in the photo. Ruiz ¶ 8; Arroyo ¶ 6-7. Ruiz asked to see the photo but was not allowed. At that point Arroyo insisted that they show her the photo. Arroyo ¶ 8. The police officer obliged, whereupon Arroyo laughed and exclaimed "that's not my sister." Arroyo ¶ 8; Ruiz ¶ 9.[2] The police

ignored this opinion and "told [Ruiz] that [she] would have to leave with them." Ruiz ¶ 10. Ruiz was allowed to stop at her table to get her coat, whereupon her husband asked what the problem was. The police told Acevedo that Ruiz "was under arrest and was being taken to the police station." Acevedo ¶ 6. Acevedo asked if he could go along and was told he could but warned "not to make trouble." Acevedo ¶ 6.

As they exited La Cascada, "the police suddenly stopped and demanded identification." Ruiz ¶ 11. Acevedo responded that they had left their personal effects in the car, and "asked if the police would allow [him] a minute before taking [Ruiz] away to enable [him] to go to the car to retrieve [their] identification. The police refused." Acevedo ¶ 7. Ruiz was then "placed into a police cruiser and taken to the police station under arrest." Ruiz ¶ 12. Ruiz alleges: "At no time did I ever volunteer to go anywhere with the police. I was transported to the police station *under arrest*. I know this because police told me so." Ruiz ¶ 14 (emphasis in original). Acevedo states: "There is no question in my mind that Haydee was not transported to the police station *voluntarily*. She was told, and I myself was told by police, that she was *under arrest*." Acevedo ¶ 8 (emphasis in original).

The police officers, on the other hand, remember the evening in a slightly different, and much more cordial, way. Police Sergeant William Earley was at the desk of the Port Chester Police Department in the early morning of February 28, 1988. Earley ¶ 1. At or about 12:15 a.m., a man entered the police headquarters and claimed that he knew the location of a fugitive. Earley ¶ 2. The man identified

1. Hereafter "Ruiz ¶ 1." All citations to affidavits will hereafter be made by simply stating the name of the affiant and the paragraph number.

2. Some time later, Ruiz saw the picture herself and claims that "[t]he woman depicted in that photo does not even bear a remote resemblance to me." Ruiz ¶ 15. Plaintiff's counsel allege in their Memorandum of Law that Haydee Ruiz is

"a blond, fair skinned, forty-seven year old" whereas Alba George, the woman depicted in the photograph, is a "dark, curly-haired thirty-three year old female." Plaintiff's Brief at p. 5. It appears from the police report that police officer Herrera knew that Alba George was only thirty-three years old. *See* Police Report attached as exhibit to Mastronardi Affidavit.

himself as Odel Jones,[3] a bail bondsman, and provided Earley with a copy of a surety bond and a photograph. Earley ¶ 2. The photo depicted a woman named Alba George, who had apparently jumped bail. Jones claimed a warrant was out for her arrest and that she was presently in town at the night club La Cascada.

Earley called the Connecticut Police Department and confirmed that there was an active warrant for George's arrest. Earley ¶ 3. Earley then directed Police Officers Herrera, Krzeminski and Monroe to go to the night club and had Jones meet them there to identify George. Earley ¶ 4.

It was about 1:20 a.m. Officers Herrera and Krzeminski proceeded to La Cascada. Herrera ¶ 2; Krzeminski ¶ 2. As the officers entered the bar with Jones by their side, Jones told them that the suspect was going to the ladies room. Herrera ¶ 4. Herrera requested the woman bartender to clear the bathroom so that the officers could talk with the suspect. Herrera ¶ 5. The bar was "very noisy and quite dim." So, when the woman came out of the bathroom, Herrera "asked if [they] could talk to her outside." Herrera ¶ 6. According to the police report filed by Herrera on February 28, 1988, "this officer asked the suspect to please step outside and that we wanted to speak to her." Police Report p. 1 attached to Mastronardi Affidavit. The woman got her coat and she and her husband "came out with [the officers]." Herrera ¶ 6.

When they arrived outside, Police Officer Monroe met them at the door. "It was a typical February night, slightly below freezing and dark. The street lights in the area do not give off much light. It had just stopped snowing and the sky was obscured." Herrera ¶ 8. The woman did not speak English well, so Herrera spoke to her in Spanish and asked her for identifica-

tion. Herrera could not understand what she was saying, except that her first name was "Heidi," that she and her husband had driven from Connecticut, but that neither she nor her husband had any identification. Herrera ¶ 9. Monroe called Earley on the radio. Earley told the officers "to ask her to come to headquarters so the matter could be cleared up." Earley ¶ 6. Herrera "then told the woman that she was not under arrest but would she please come to headquarters." Herrera ¶ 11. The woman agreed and her husband asked to go along. She got in the front seat of Monroe's car and her husband got in the front seat of Herrera's car and they all drove to headquarters. Herrera ¶ 12.

Once at the police station, the woman gave Earley her name and address. Earley put it through a licence check in Connecticut, which verified her statement. Earley then compared Ruiz to the photograph provided by Jones and determined that she was not Alba George. Earley ¶ 7. Earley then directed Monroe to drive them back to the night club. Ruiz was only in the police station for ten minutes. Earley ¶ 7. The police report recites: "suspect was brought into HQ's at 0125 hrs. and by 0135 hrs., she was informed that she was released and free to leave." Police Report at p. 2.

On November 1, 1988, Ruiz filed this civil action against police officers Herrera, Earley, Krzeminski, and Monroe, in their individual and official capacities, and against bail bondsman Burden, his company, and Jones. Her complaint states two counts, one for false arrest pursuant to 42 U.S.C. § 1983 (Count One), and another for common law negligence (Count Two).

### Discussion

Defendants Herrera, Earley, Krzeminski, and Monroe move for summary judgment. First, they argue that the claim for negli-

---

**3.** Odel Jones is a private investigator licensed in Ohio. Jones ¶ 4. On the evening of February 27, 1988, Jones was "bodyhunting" for Barney Burden, a professional bail bondsman. Jones ¶ 3. In March 1987, Burden had furnished a $50,000 bail bond for Alba George on a criminal case in the Superior Court of the State of Connecticut at Stamford. Burden ¶ 4. George

failed to appear, a warrant was issued for her arrest, and Burden's bond had been forfeited. Burden ¶ 5. Burden contacted Jones in December 1987 and offered him his usual fee (10% of the outstanding bond) if Jones located George and caused George to be arrested and brought back to the jurisdiction of the court. Burden ¶ 6.

gence (Count Two) must be dismissed because plaintiff did not file a notice of claim against the municipality. In addition, they argue that there is no issue of material fact regarding the negligence claim and that they are entitled to judgment as a matter of law. Second, they claim that the false arrest claim (Count One) is barred by the doctrine of qualified immunity. Defendant Burden also moves to dismiss the complaint for failure to state a claim.[4]

A. *New York General Municipal Law § 50–e et seq.:*

Defendant police officers contend that the negligence count in this civil action is barred. They argue that since they were on duty at the time of the alleged negligence, plaintiff was required by New York General Municipal Law § 50–e and j to file a notice of claim against the village of Port Chester. Plaintiff responds that the village of Port Chester is not named a defendant, and therefore that Section 50–e by its very terms is not applicable to this action.

■ Section 50–e(1) of the General Municipal Law provides in relevant part:

(a) In any case founded upon tort where a notice of claim is required by law as a condition precedent to the commencement of an action or special proceeding against ... any officer, appointee or employee [of a public corporation], the notice of claim shall comply with and be served in accordance with the provisions of this section within ninety days after the claim arises ...

(b) ... If an action or special proceeding is commenced against [an officer, appointee or employee of a public corporation], but not against the public corporation, service of the notice of claim upon the public corporation shall be required only if the corporation has a statutory obligation to indemnify such person under this chapter or any other provision of law.

As to the indemnification of police officers for negligent conduct in the perform-

ance of duties, Section 50–j(1) provides in relevant part that:

... every city, county, town, village, authority or agency shall be liable for, and shall assume the liability to the extent that it shall save harmless, any duly appointed police officer of such municipality, authority or agency for any negligent act or tort, provided such police officer, at the time of the negligent act or tort complained of, was acting in the performance of his duties and within the scope of his employment.

The rule of law that emerges is that the filing of a notice of claim is a prerequisite to filing a civil action in tort against an on-duty police officer.

Plaintiff argues that the statute does not explicitly state that "no action exclusively against police officers can be prosecuted unless a notice of claim is served on the public corporation." It is true that this language is missing and that it is the traditional language by which the notice of claim requirement is implemented. The provision that enforces Section 50–e is Section 50–i, which states:

No action or special proceeding shall be prosecuted or maintained against a city, county, town, village, fire district of school district for personal injury ... alleged to have been sustained by reason of the negligence ... of any officer, agent, or employee thereof ... unless, (a) a notice of claim shall have been made and served upon the city, county, town, village, fire district or school district in compliance with section fifty-e of this chapter ...

Similarly, Section 9801(1) of the Civil Practice Law and Rules provides that:

No action shall be maintained against the village for personal injury or injury to property alleged to have been sustained by reason of the negligence or wrongful act of the village or of any officer, agent or employee thereof, unless a notice of claim shall have been made and served in compliance with section fifty-e of the general municipal law.

---

**4.** That motion is only on behalf of "Barney Burden." I assume it is intended to cover defendant "Barney Burden Bailbond Company" as well.

In addition, Section 50–j of the Municipal Law creates a cause of action against a public corporation for indemnification (§ 50–j(1)), as well as a cause of action against off-duty police officers for negligent performance of a public duty (§ 50–j(2)). Again, the enforcement mechanism at § 50–j(3) provides:

> No action or special proceeding instituted hereunder shall be prosecuted or maintained against the municipality, authority or agency concerned or such police officer unless notice of claim shall have been made and served upon such municipality, authority or agency in compliance with section fifty-e of this chapter.

█ Defendants at bar cannot point to comparable statutory language barring this particular claim. But the analysis does not end there. The General Municipal Law explicitly states at Section 50–e(1)(b) that "[i]f an action ... is commenced against [any employee of a public corporation], but not against the public corporation, service of the notice of claim upon the public corporation *shall be required* only if the corporation has a statutory obligation to indemnify such person under this chapter" (emphasis added). Public corporations are under a statutory obligation to indemnify their police officers for negligence on the job. § 50–j(1).

In *Fitzgerald v. Lyons*, 39 A.D.2d 473, 336 N.Y.S.2d 940 (4th Dept.1972), the Fourth Department addressed a situation similar to the case at bar and ruled that the service of a notice of claim was a prerequisite to filing an action against a city employee involved in a car accident. In *Fitzgerald*, a plaintiff sued an engineer for the City of Buffalo who allegedly ran into him while driving an automobile owned by the City. Plaintiff did not make the City of Buffalo a party to the civil action, but he did file a timely notice of claim with the City, which was obligated to indemnify the engineer under Section 50–b of the General Municipal Law. However, plaintiff failed to commence the civil action within the one year and 90 day statute of limitations provided by Section 50–i.

The Appellate Division held in *Fitzgerald* that:

> Where a municipal employee is operating a municipally owned vehicle within the scope of his employment at the time of an accident and is entitled to be indemnified under section 50–b, the municipality is the real party defendant in interest and the provisions of sections 50–e and 50–i of the General Municipal Law relative to the service of a notice of claim and the short statute of limitations of one year and 90 days are applicable to any action against the employee arising therefrom.

*Id., supra*, 336 N.Y.S.2d at 942. Since the Court found that the employee was acting within the scope of his employment, the Court ruled that the action was barred for failure to comply with Section 50–i. It is to be noted, of course, that nowhere does the statute explicitly state that "no action against a city employee shall be prosecuted unless notice is given to the municipality." Instead, the Court required notice because the City of Buffalo was the real party in interest.

█ *Fitzgerald* is closely analogous to the case at bar, since the indemnity provisions in § 50–b are the functional equivalent of § 50–j(1) in respect of police officers. Accordingly, I conclude that plaintiff here was required to serve a notice of claim on the village of Port Chester as a condition precedent to filing this civil action against the police officers, even though she did not name the village as a defendant.[5]

---

5. Defendants rely on *Alifieris v. American Airlines*, 63 N.Y.2d 370, 482 N.Y.S.2d 453, 472 N.E.2d 303 (1984), for this conclusion. However, that case is distinguishable. In *Alifieris*, the Court of Appeals ruled that a plaintiff suing an off-duty police officer was required to serve a notice of claim on the municipality. In *Alifieris*, plaintiff sued *inter alia* an off-duty police officer. Plaintiff did not sue the municipality.

Instead, the off-duty police officer instituted a third-party complaint for indemnification from his employer, Suffolk County, and also interposed an affirmative defense to the original complaint that plaintiff had failed to serve a notice of claim against the County. The Court of Appeals held that the off-duty police officer would be entitled to indemnification under Section 50–j if he was performing public duties at

There is no question that the officers were acting in the performance of their duties and within the scope of their employment at the time of the incident and are covered by the indemnification provision of Section 50–j(1). Since plaintiff failed to serve a notice of claim on the village of Port Chester, the claim of negligence against the defendant police officers must be dismissed.[6]

### B. *Qualified Immunity:*

Next, defendant police officers claim that they are entitled to qualified immunity with respect to the claim under 42 U.S.C. § 1983.

Before reaching the issue of qualified immunity, it is appropriate first to examine the substance of plaintiff's claim. In Count One of the Complaint, entitled "42 U.S.C. Section 1983—False Arrest," Ruiz claims that defendants caused her "to be wrongfully and improperly stopped, seized, searched and detained, without probable cause, in violation of ... the Fourth and Fourteenth Amendments of the Constitution of the United States, and 42 U.S.C. Section 1983." Complaint ¶ 7.

■ Section 1983 provides *inter alia* that any person who, under color of state law, deprives another of her rights secured by the Constitution, shall be liable to the

party injured. 42 U.S.C. § 1983. The deprivation must be intentional or deliberate; negligent conduct on behalf of a state official does not amount to a violation of § 1983. *Daniels v. Williams*, 474 U.S. 327, 336, 106 S.Ct. 662, 667, 88 L.Ed.2d 662 (1986); *Davidson v. Cannon*, 474 U.S. 344, 347, 106 S.Ct. 668, 670, 88 L.Ed.2d 677 (1986).

The Fourth Amendment to the United States Constitution guarantees citizens the right to be secure against unreasonable seizures and requires that no arrest warrant be issue without probable cause. This Amendment has been interpreted to require that an arrest be supported by probable cause. Probable cause exists if the circumstances known to the officer are sufficient "to lead a reasonable and prudent person to believe, not merely suspect, that a crime has been ... committed." *United States v. Place*, 660 F.2d 44, 47 (2d Cir. 1981).

■ Thus, if a police officer deliberately arrests someone without probable cause, he is liable under 42 U.S.C. § 1983. If, on the other hand, a police officer arrests someone with probable cause, but by mistake, there is no constitutional violation. *Baker v. McCollan*, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979) (no constitu-

---

the time of the incident. The Court then stated that if the police officer was entitled to indemnification, plaintiffs were required to file a notice of claim. The Court relied on Section 50–j(3). *Id., supra*, 482 N.Y.S.2d at 456, 472 N.E.2d at 305–06. Section 50–j(3), however, only applies to actions "instituted hereunder," i.e. to actions instituted under 50–j. In *Alifieris*, the action against the police officer was instituted under 50–j(2) since he was off-duty. In this case, however, the officers were on duty and therefore Section 50–j(3) does not apply.

**6.** Although there existed previously a sharp disagreement between federal and state courts in New York as to whether General Municipal Law 50–e applied to civil rights cases under 42 U.S.C. § 1983, *compare Burroughs v. Holiday Inn*, 621 F.Supp. 351 (W.D.N.Y.1985) (§ 50–e does not in § 1983 cases) and *Doty v. Rochester City Police Department*, 625 F.Supp. 829 (W.D.N.Y.1986) (same) *with 423 So. Salina Street v. City of Syracuse*, 68 N.Y.2d 474, 510 N.Y.S.2d 507, 503 N.E.2d 63 (1986) (explicitly disagreeing with *Burroughs*), that issue has been resolved by the Supreme Court in *Felder v. Casey*, 487 U.S. 131,

108 S.Ct. 2302, 101 L.Ed.2d 123 (1988), where the Court held notice of claim statutes inapplicable in § 1983 cases.

In addition, while the issue was not briefed by the parties, I note that plaintiff may not be entitled to the punitive damages that she prayed for in her Complaint. In *Sharapata v. Town of Islip*, 56 N.Y.2d 332, 452 N.Y.S.2d 347, 437 N.E.2d 1104 (1982), the Court of Appeals "asserted a complete ban upon punitive damages" against the State and its political subdivisions; and in *Myers v. City of Rochester*, 116 Misc.2d 83, 455 N.Y.S.2d 188, 190 (1982), the Supreme Court, Monroe County, held that the immunity against punitive damages enjoyed by municipalities applies as well to police officers acting within the scope of their employment, since a "municipality is the real party in interest when there is a tort action brought against a police officer to whom the municipality has a duty to indemnify." *Id.* Thus, there is a serious question about the availability of punitive damages in this action.

tional violation where person arrested with probable cause and pursuant to valid arrest warrant but by mistake)[7]; *Francois v. United States*, 528 F.Supp. 533, 536 (E.D. N.Y.1981) (same).

The rule was articulated by the Supreme Court in *Hill v. California*, 401 U.S. 797, 802, 91 S.Ct. 1106, 1110, 28 L.Ed.2d 484 (1971), in slightly different terms. There, the Court stated that "[w]hen the police have probable cause to arrest one party, and when they reasonably mistake a second party for the first, then the arrest of the second party is a valid arrest." *Id.* (quoting the California Supreme Court decision). The Court explained the situation in *Hill* as follows:

> The police unquestionably had probable cause to arrest Hill; they also had his address and a verified description. The mailbox at the indicated address listed Hill as the occupant of the apartment. Upon gaining entry to the apartment, they were confronted with one who fit the description of Hill received from various sources. That person claimed he was Miller, not Hill. But aliases and false identifications are not uncommon. Moreover, there was a lock on the door and Miller's explanation for his mode of entry was not convincing. He also denied knowledge of firearms in the apartment although a pistol and loaded ammunition clip were in plain view in the room. The upshot was that the officers in good faith believed Miller was Hill and arrested him. They were quite wrong as it turned out.... But sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment and on the record before us the officers' mistake was understandable

and the arrest a reasonable response to the situation facing them at the time. *Hill, supra,* 401 U.S. at 803–04, 91 S.Ct. at 1110–11.

Plaintiff has brought to the Court's attention a case from the Southern District of Texas, *United States v. Palacios,* 666 F.Supp. 113 (S.D.Tex.1987), which is strikingly similar to the instant action. In that case, plaintiff Juan Palacios, Sr. was mistaken for his son, Juan Palacios, Jr., and arrested pursuant to a valid warrant for his son's arrest. The officers executing the warrant had a photocopy of a drivers license containing a photograph of the suspect, Palacios Jr., and the father's address, which incidentally was across the street from his son's. The officers went to Palacios Sr.'s home, arrested the father and took him out to their car. They then "drove the Defendant about ½ block down the street, stopped, [and] read him his Miranda rights." *Id.* at 114. As the Court explained:

> It was at this point that Officer Perez began to doubt the Defendant's identity. The two officers, apparently along with others, had gathered at the central meeting place earlier that morning to be briefed on the various warrants that would be executed that day. On that occasion, Perez acknowledged that he had "glanced" at the photograph that had accompanied this warrant. Now that the Defendant had been arrested and placed in the automobile, Perez again looked at the photograph and could readily see that it was not a picture of the Defendant. The Defendant was promptly returned to his house and the officers proceeded to arrest Juan Palacios, Jr."

7. In *Baker v. McCollan,* the Court held that false imprisonment following an arrest with probable cause and pursuant to a valid arrest warrant does not give rise to a constitutional violation. In *Baker,* the plaintiff's name and description were in the possession of the law enforcement agency because his brother had stolen his driver's license, had been arrested while in possession of that license and had subsequently jumped bail. The plaintiff was arrested with probable cause pursuant to a facially valid warrant and detained for three days. The plaintiff

in *Baker* raised a claim for false imprisonment, which the Court interpreted as a claim for the negligent failure to institute adequate identification procedures after a proper arrest. As the Court recognized, no one made any suggestion "that [plaintiff's] arrest was constitutionally deficient." *Id., supra,* 443 U.S. at 143, 99 S.Ct. at 2694. Of course, the situation is different in the case at bar since Ruiz claims that she was arrested without probable cause. *Compare with Baker, supra,* 443 U.S. at 145, 99 S.Ct. at 2695.

*Id.* The government subsequently brought charges against Palacios Sr., because he was a convicted felon in possession of a .38 caliber revolver. The officers had seen the revolver in plain view on top of a dresser when they entered his apartment to arrest him. The action was before the Court on Palacios Sr.'s motion to suppress the revolver as the fruit of an illegal arrest.

The Court first held that the arrest was illegal because the officers did not have probable cause. The Court explained: "It is obviously undisputed that the officers arrested this Defendant without an arrest warrant and without probable cause to believe he had committed any crime." *Id.* The Court then addressed whether the police officers had made a reasonable mistake and, thus, whether the evidence could be introduced under the "good faith" exception to the exclusionary rule:

> The ultimate issue in this case, therefore, is whether the mistake was a reasonable one. The Court concludes that it was not. Both officers had an opportunity to look at a photograph of Juan Palacios, Jr. before they even journeyed to his purported residence. Agent Lawrence acknowledged that he examined the drivers license, but that he did not pay attention to the "details" on it. He further acknowledged, however, that he believed he was looking for a person whose age would be in the twenties. Perez also looked at the photograph at the original briefing session, but says he only "glanced" at it. There is virtually no resemblance between this Defendant and the person in the photograph. The Defendant is obviously a much slimmer and older man.

*Id.* at 115. Because the agents were looking for a man in his twenties, had ample opportunity to look at the photo of the suspect and nevertheless arrested an individual bearing virtually no resemblance to the suspect, the Court found that their mistake was not reasonable and suppressed the evidence. *Id.*

 In the case at bar, the ultimate question on the merits is whether the officers acted deliberately and unreasonably in arresting Ruiz—assuming of course that she was arrested. Clearly, they did not have a warrant for *her* arrest. However, they may have had probable cause for her arrest, even though they were wrong, if the facts and circumstances known to them and of which they had reasonable, trustworthy information were sufficient to warrant a prudent person in believing that she was Alba George, as to whom a valid warrant existed.

With this in mind, I turn next to the doctrine of qualified immunity. As the Second Circuit explained recently in another case involving false arrest:

> Government officials performing discretionary functions are shielded from personal liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 [102 S.Ct. 2727, 2738, 73 L.Ed.2d 396] (1982). Even where the law is "clearly established" and the scope of an official's permissible conduct is "clearly defined," the qualified immunity defense also protects an official if it was "objectively reasonable" for him at the time of the challenged action to believe his acts were lawful. *Anderson v. Creighton*, 483 U.S. 635, 641 [107 S.Ct. 3034, 3039, 97 L.Ed.2d 523] (1987) ...

*Warren v. Dwyer*, 906 F.2d 70, 74 (2d Cir.1990).

The Court explained that the question of immunity is distinct from the question of probable cause. "For example, evidence might be sufficient to support a verdict that probable cause for an arrest was lacking under the actual circumstances as determined by the jury, without a showing it was unreasonable for an officer to mistake the existence of probable cause at the time." *Id.*, at 75. The question regarding immunity is whether officers of reasonable competence could disagree on whether there was probable cause to support a warrant. *See id.; Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

In the case at bar, the law was clearly established that an arrest had to be sup-

ported by probable cause and that probable cause was to be determined by reviewing the totality of the circumstances. Therefore, the issue of qualified immunity must turn on whether the officers acted in an objectively reasonable fashion, i.e. whether it was objectively reasonable for them to believe that, based on all the facts known to them, a prudent person would believe that Ruiz was Alba George.

The central facts in this case are clearly in dispute, which may render defendants' defense of immunity premature. *See Warren v. Dwyer, supra,* at 74 ("[p]re-trial resolution of the defense, however, may be thwarted by a factual dispute … Courts thus have permitted the defense to be raised at the close of plaintiff's evidence on a motion for a directed verdict, and even on a subsequent motion for judgment notwithstanding the verdict"). Nevertheless, defendants would be entitled to judgment at this juncture if, taking all of plaintiff's allegations as true, the Court nonetheless determined that defendants acted in good faith. Thus, for purposes of this motion, I will assume that Ruiz's account of the incident is correct.

■ Plaintiff argues on the basis of three crucial facts that the police officers did not act in an objectively reasonable fashion. First, the defendants' affidavits and the police report are entirely silent on whether anyone questioned Odel Jones about the reliability of his information. Second, the police officers had ample opportunity to examine the photograph of Alba George and to compare the photograph with Ruiz when they encountered her. Finally, the officers refused Ruiz permission to retrieve identification from the glove compartment of her car.

On the other hand, defendants argue that they acted reasonably because (1) they knew of the existence of a warrant for Alba George's arrest, (2) "a positive identification [had been] made by one with reason to know," and (3) Ruiz "fail[ed] to produce identification and [was unable] to identify herself or give her address even when asked in her own language." Defendants' Brief at p. 6.

There is no dispute that Ruiz did not resemble the woman depicted in the photograph. Officer Herrera states in his report that "the suspect had a very narrow nose an[d] facial structure [as] opposed to the picture of the wanted person who had a very wide nose and a few other different characteristics." Police Report p. 2. A cursory glance at a photocopy of the photograph, attached as Exhibit B to defendants' Notice of Motion, reveals that the woman depicted in the photo does in fact have a very wide nose. In addition to distinct facial traits, there is also a substantial age disparity. According to the police report, Ruiz was 46 years old, whereas George was 33. Police Report at p. 1. The officers realized they had misidentified Ruiz the minute they compared her to the photograph at the police station. Earley ¶ 7; Herrera ¶ 14; Krzeminski ¶ 13. However, the officers apparently had the photograph with them when they first encountered Ruiz and when they accosted Ruiz in private in the ladies' room. At that time, Ruiz's sister saw the photograph, laughed, and exclaimed that Ruiz was not the woman in the picture. Arroyo ¶ 8. Based on all these facts, it would seem that the police officers should have known when they encountered Ruiz that she was not the female fugitive.

In addition, even before the officers entered the night club, it is questionable whether they had probable cause to believe that the woman in the night club was the female fugitive. The police report states that Odel Jones entered police headquarters and "stated to Sgt. Earley that he had confirmed that the wanted person, Alba George, was inside La Cascada Bar." Police Report at p. 1. Based on that information, Herrera "got clearance from HQ's to go inside and look for the suspect and bring same to HQ's for confirmation." *Id.* Sergeant Earley confirms this version of the events in his affidavit, where he states:

> 2. At or about 12:15 A.M. a man identifying himself as Odel Jones came to police headquarters, identified himself as a bail bondsman, provided me with a copy of a surety bond, annexed as Exhib-

it A, and picture, annexed as Exhibit B. He informed me that Alba George had failed to appear to answer a narcotics sale charge in the Superior Court in Connecticut, that there was an active warrant against her and that she was presently in the La Cascada Bar in Port Chester, New York.

3. I called the Department of Public Safety State Police, Westport, Connecticut Barracks, and Trooper Edwards confirmed that there was an active warrant for Alba George, who was wanted in Connecticut Superior Court for failure to answer a narcotics sale charge.

4. I then directed Police Officers Herrera, Krzeminski and Monroe to La Cascada Bar ...

Earley ¶¶ 2, 3 and 4. What is notably missing is an investigation into the reliability of Jones' information that the fugitive was presently at the night club. The mere fact that Jones was correct about the warrant does not eliminate Earley's duty to investigate the basis of Jones' claim about the whereabouts of Alba George. The record is entirely silent as to why Jones thought Ruiz was Alba George. Thus, there is a substantial question whether the officers had probable cause to arrest Ruiz (as she claims) when they encountered her in the ladies' room.

In these circumstances, it was unreasonable for the police officers not to permit Ruiz or her spouse, Acevedo, to retrieve identification from their car. The only information the police officers had was the word of an unknown bail bondsman. They did not know why he thought the fugitive was at the night club. The woman they were investigating did not even remotely resemble the person depicted in the photograph. Clearly, the reasonable course would have been to permit Ruiz or her husband to get their identification. Alternatively, the three police officers and one

bail bondsman could have accompanied Ruiz to her car and obtained the identification themselves.

Although it is a delicate task to second guess what a police officer in the line of duty should have done, I must conclude that, accepting plaintiff's account of the incident, it was not reasonable for the officers to arrest Ruiz and transport her to police headquarters without giving her the chance to exonerate herself by retrieving identification, given all the other circumstances surrounding the incident. I therefore deny defendants' motion for judgment on their defense of immunity.[8]

### C. *Jones' Status as an Independent Contractor:*

█ Finally, defendant Barney Burden claims that the complaint fails to state a claim against him because he cannot be held liable for the actions of an independent contractor, defendant Jones. In support of his motion, Burden states that Jones is a private investigator and is not employed by the Barney Burden Bailbond Company. Burden ¶ 7. Instead, Burden agreed to pay Jones ten percent of the bond if and only if he located the fugitive and caused the fugitive to be arrested and brought back to the jurisdiction. Burden ¶ 7. Jones submitted a similar affidavit attesting to these same facts. Plaintiff opposes the motion, claiming that there is contradictory evidence in the record, but that, in any event, these facts are exclusively within the control of defendants Burden and Jones and that she should be allowed discovery into the matter.

Rule 56(f), Fed.R.Civ.P., provides:
Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the ap-

---

**8.** The parties have not briefed, and accordingly I do not reach, the issue of whether defendants' conduct rises above the level of negligence. It must do so if plaintiff is to recover, since "the Due Process Clause of the Fourteenth Amendment is not implicated by the lack of due care of an official causing unintended injury to life, liberty, or property. In other words, where a

government official is merely negligent in causing the injury, no procedure for compensation is constitutionally required." *Davidson v. Cannon, supra,* 474 U.S. at 347, 106 S.Ct. at 670. "Deliberate or callous indifference" to plaintiff's requests would suffice, *ibid,* or police conduct that rises to the level of "recklessness," *id.* at 350, 106 S.Ct. at 672 (BRENNAN, J., dissenting).

plication for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

In the case at bar, plaintiff cannot effectively oppose defendant Burden's motion without discovery into the relationship between Burden and Jones. It is not at all clear whether that relationship is one of independent contractor or employee. The police report and the affidavit of Sergeant Earley reflect that Jones introduced himself as a bail bondsman, not as an investigator. Thus, in order to allow plaintiff the opportunity to oppose Burden's motion, I will allow discovery limited to the agency question.

### Conclusion

For the foregoing reasons, the motion for summary judgment of defendants Earley, Herrera, Krzeminski and Monroe is granted as to Count Two and denied as to Count One. The motion to dismiss of defendant Burden is stayed pending limited discovery into the agency relationship between Jones and Burden. The limited discovery shall be completed within sixty (60) days of the date of this Order. All other discovery may proceed and a discovery deadline will be set at a pre-trial conference on November 2, 1990. The parties are directed to attend the pre-trial conference on November 2, 1990, at 2:30 p.m. in Courtroom 307.

It is SO ORDERED.