**James D. BAILEY, Plaintiff,**

v.

**William R. KENNEY, a/k/a Bill Kenney, Bobby Wiley, Darrell Haynes, and the City of Wichita, Kansas, Defendants.**

**Civ. A. No. 90–1257–B.**

United States District Court,
D. Kansas.

April 16, 1992.

Stephen E. Robison, Joseph, Robison & Anderson, P.A., Wichita, Kan., for plaintiff.

Jack Focht, Focht, Hughey, Hund and Calvert, H.E. Jones, Hershberger, Patterson, Jones & Roth, Ed L. Randels, Asst. County Counselor, Wichita, Kan., for defendants.

## MEMORANDUM AND ORDER

BELOT, District Judge.

This matter is before the court on the motion of all defendants for summary judgment. The violations alleged by plaintiff arise out of the forced entry into plaintiff's home on May 16, 1989 by a bail bondsman and two Wichita police officers. Believing plaintiff to be a fugitive who had skipped bond, the bondsman and police officers entered plaintiff's home and detained him. After determining that plaintiff was not the fugitive, plaintiff was released and the parties left his home.

Plaintiff brings this action against the bondsman, the officers, and the City of Wichita under 42 U.S.C. § 1983, alleging violations of the Fourth, Fifth, and Fourteenth amendments to the Constitution. Plaintiff also alleges pendent state claims for trespass, assault, outrageous conduct, and false imprisonment.

### I. *Material Facts*

A number of facts are not in dispute. Defendant Kenney is a professional surety who writes bail bonds. Ross Greenfeather, who is not a party to this action, acted as the agent of Kenney in writing a bail bond upon Kenney's assets for one James D. Bailey. Bailey had been charged with aggravated battery. When Greenfeather bonded Bailey out of jail, Greenfeather received certain information from him, including where Bailey worked, where he lived, addresses, and telephone numbers.

Bailey failed to make his court appearance, and an alias warrant was issued for the arrest of James D. Bailey. Greenfeather checked the information he had received from Bailey, but was unable to locate him. Greenfeather discovered that Bailey did not live at the address he had given and that

Bailey had quit his job after he had been bonded out. Greenfeather contacted Bailey's mother three or four times and also contacted Bailey's sister, who he had found through her ex-husband. Both women professed ignorance as to Bailey's whereabouts, although Greenfeather did not believe them. The Chief of Police of Clearwater also reported to Greenfeather that Bailey's brother in Clearwater did not know where Bailey was, although this source deemed the brother to be untrustworthy. Greenfeather also attempted to find previous addresses for Bailey through a connection in the sheriff's office.

Greenfeather eventually came upon the address of 518 South Glendale as the address for one James D. Bailey, the plaintiff herein. Greenfeather discovered this address from court records in the Domestic Division of the Clerk of the District Court. Greenfeather did not attempt to ascertain how long the James Bailey of 518 South Glendale had resided at this address. Greenfeather contacted the landlord for 518 South Glendale and verified that a James Bailey lived at the address. No further information regarding plaintiff was discussed between Greenfeather and the landlord.

Greenfeather went to 518 S. Glendale the same evening he discovered this address through the Court Clerk's Office. He knocked at the door and received no response. Thereafter, he placed the house under surveillance from a block away, from which he eventually observed an individual walk in. It was dark and Greenfeather could only identify the individual as a male. Greenfeather approached the house and knocked on the door, but received no response. Greenfeather then called defendant Kenney for assistance.

When Kenney arrived, Greenfeather informed him that the person in the house had not parked in the parking garage or across from his apartment, but had parked some way south of where he lived. Greenfeather also reported that he had seen lights go on from room to room; that he had heard movement within the house;

that he had knocked and received no response; and that he had talked to the landlord earlier that day. After conversing with Greenfeather, Kenney called the 911 police dispatcher and told the dispatcher that he had information on a wanted felon who was at 518 S. Glendale. Kenney told the dispatcher that "we would like to have some officers stand by." (Kenney Depo. at 27).

Greenfeather and Kenney met Lt. Haynes and Officer Wiley a few blocks from plaintiff's residence. There is some dispute as to what Kenney told the officers when they arrived. According to Kenney, he informed the officers that they had verified that a James D. Bailey lived there, and that they needed to determine if this was the James D. Bailey who was wanted in the warrant. Haynes, however, testified that Kenney informed him that there was a bond forfeiture at the residence. (Haynes Depo. at 29). Haynes did not ask Kenney how long Bailey had resided at 518 S. Glendale. Either Haynes or Wiley ran a license tag check on the car that Kenney identified as belonging to the resident of the house, and this check revealed that the car was registered to James D. Bailey at 518 S. Glendale. (Haynes Depo. at 39).

The police officers parked their white police cars on a side street adjacent to plaintiff's residence. The cars were prominently identified as police cars and could be seen from plaintiff's residence. Kenney, Greenfeather, and the two police officers approached the front door and knocked. They knocked for a few minutes, but no one came to the door. The officers yelled: "Police Officers, come to the door."

When no one answered the door, some members of the party went to a neighbor's house with a mug shot photo of James D. Bailey that Greenfeather had gotten from the records section of the sheriff's office. The neighbor, Mr. Handley, was shown the photo and was asked whether it was a picture of his neighbor. As Handley re-

called in his deposition, he told the persons that he did not think the person in the photo was his neighbor, but that he could not be sure.[1] Greenfeather, however, recalls that Handley said he "couldn't say" whether the photo and the neighbor were the same, (Greenfeather Depo. at 59), and Lt. Haynes recalls that Handley said the photo "looked like him but he couldn't be sure." (Haynes Depo. at 39).

The party resumed knocking at the door and announcing that they were police officers. Kenney then went to his car phone and called the landlord. Kenney informed the landlord that the police were there and that James D. Bailey was wanted as a bond forfeiture. He asked the landlord if he would come up and let them in. The landlord said he did not want to be involved but that if they had to go in, the least amount of damage they could do would be to break a small pane in the back door. The landlord testified that he considered plaintiff to be one of his best tenants and was surprised to learn that plaintiff was in any kind of trouble. The landlord does not remember whether he communicated his surprise to Kenney. (Hixon Depo. at 4, 7–8).

Kenney returned to the party and the decision was made to forcibly enter the residence. Kenney told Haynes that they could enter and search for their bond forfeitures, and that they did it all the time. According to Lt. Haynes, Kenney informed Haynes that the landlord was scared of Bailey, (Haynes Depo. at 49), although Kenney denies making this statement to Haynes. (Doc. 72, at 4–5). Kenney used a flashlight to break out a pane on the back door, and he and Haynes entered through the back door. Haynes had his gun drawn upon entering the premises. The front door was opened, and Officer Wiley came in with his gun drawn. Eventually, Greenfeather followed Wiley into the house.

Plaintiff came out of another room, whereupon Haynes and Wiley pointed their

---

**1.** Handley testified that he said: " 'Gee, I didn't think that could be so.' Then they asked if I was sure, if I was sure. I said, 'I don't think it is.' But, you know, I'm not an expert on identi-

fication, and for all I know he has plastic surgery or something. You know, I'm not an expert in that." (Handley Depo. at 9).

guns at him. Plaintiff was not free to leave. Plaintiff was wearing only undershorts and told to keep his hands up. Plaintiff was cooperative and appeared frightened. Plaintiff was asked to produce identification, which he did. His identity was checked against the mug shot, and it was determined that plaintiff was not the fugitive. Plaintiff explained that he had not come to the door because it was his birthday; he had been "partying" earlier; and he thought his friends were trying to play a joke on him. Apologies were made to plaintiff, and Kenney left $20 to pay for the broken window pane.

All defendants move for summary judgment, alleging *inter alia*, that they are entitled to qualified immunity from prosecution for plaintiff's § 1983 claims.

## II. *Standards for Qualified Immunity*

 Qualified immunity is available to state actors who perform discretionary functions if their actions do not violate clearly established law of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The standard is one of "objective legal reasonableness" in light of the legal rules that were "clearly established" at the time the challenged action took place. *Id.* at 818–19, 102 S.Ct. at 2738. Whether the official violated clearly established law is both a legal and a fact specific question that depends upon all the circumstances facing the official at the time the alleged violation occurred. *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987):

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. That is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Creighton*, 483 U.S. at 640, 107 S.Ct. at 3039. *See also V–1 Oil Co. v. Wyoming,*

*Dep't of Envtl. Quality*, 902 F.2d 1482, 1487 (10th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 295, 112 L.Ed.2d 249 (1990). As a practical matter, this means that even if the plaintiff's rights were in fact violated, the defendant is entitled to qualified immunity if officials of reasonable competence could disagree as to whether their conduct violated a clearly established federal right of plaintiff. *Creighton*, 483 U.S. at 638 & 641, 107 S.Ct. at 3038 & 3039; *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986); *Salmon v. Schwarz*, 948 F.2d 1131, 1141 (10th Cir. 1991). Although resolution of this issue is fact specific, it entails an objective legal inquiry that normally must be resolved by the trial court before trial. *Hunter v. Bryant,* —— U.S. ——, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991); *Snell v. Tunnell,* 920 F.2d 673, 696 (10th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1622, 113 L.Ed.2d 719 (1991).

 When the issue of qualified immunity is raised, the plaintiff must

> come forward with facts or allegations to show both that the defendant's alleged conduct violated the law and that law was clearly established when the alleged violation occurred. Unless such a showing is made, the defendant prevails. If the plaintiff has identified the clearly established law and the conduct that violated the law, the defendant as the movant in a motion for summary judgment bears the normal burden of showing that no material issues of fact remain that would defeat his or her claim of qualified immunity.

*Pueblo Neighborhood Health Centers, Inc. v. Losavio*, 847 F.2d 642, 646 (10th Cir. 1988) (citation omitted). Qualified immunity is not simply an affirmative defense, but rather is an " 'entitlement . . . to *immunity from suit'* . . . and 'is effectively lost if a case is erroneously permitted to go to trial.' " *Siegert v. Gilley,* —— U.S. ——, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985)) (emphasis in original). For this reason, the existence of qualified immunity should be determined at the earliest possi-

ble stage of litigation. *Creighton*, 483 U.S. at 646 n. 6, 107 S.Ct. at 3042 n. 6; *Hunter*, 112 S.Ct. at 537.

Finally, in ruling on the claim of qualified immunity, the trial court "should identify the law upon which it relied and state the basis for its conclusion." *Pueblo Neighborhood*, 847 F.2d at 646.

## III. *Qualified Immunity of Police Officers*

■ The specific conduct that plaintiff challenges is the "warrantless entry and search" of his residence. Plaintiff notes that the arrest warrant for the fugitive of the same name was neither an arrest warrant for plaintiff nor a search warrant for his residence. Thus, plaintiff argues, because no warrant authorized the search, and because no exigency excused the warrant requirement, the search was illegal.

Plaintiff correctly notes that "[i]t is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980). *See also Illinois v. Rodriguez*, 497 U.S. 177, 110 S.Ct. 2793, 2797, 111 L.Ed.2d 148 (1990). Plaintiff's argument ignores, however, that this search was made under the auspices of a concededly valid arrest warrant for a person of the same name as plaintiff. Given this fact, the legality of the entry into plaintiff's house turns upon the standard of conduct constitutionally required before state actors armed with an arrest warrant for a person may enter a residence for which they have no search warrant.

In *Payton v. New York*, 445 U.S. 573, 603, 100 S.Ct. 1371, 1388, 63 L.Ed.2d 639 (1980), the Court stated *in dicta* that "for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives *when there is reason to believe the suspect is within.*" (emphasis added). *Cf. Steagald v. United States*, 451 U.S. 204, 213–16, 101 S.Ct. 1642, 1648–50, 68 L.Ed.2d 38 (1981) (search warrant needed for execution of arrest warrant at third party's residence). Although this Circuit has not expressly adopted this *dicta*, other circuits appear to accept this statement uniformly.[2] *See United States v. Pallais*, 921 F.2d 684, 690 (7th Cir.1990), *cert. denied*, —— U.S. ——, 112 S.Ct. 134, 116 L.Ed.2d 101 (1991); *United States v. Litteral*, 910 F.2d 547, 553 (9th Cir.1990); *Washington v. Simpson*, 806 F.2d 192, 196 (8th Cir.1986); *Dale v. Bartels*, 732 F.2d 278, 285 n. 10 (2d Cir.1984); *United States v. Beck*, 729 F.2d 1329, 1331–32 (11th Cir.), *cert. denied*, 469 U.S. 981, 105 S.Ct. 383, 83 L.Ed.2d 318 (1984); *see also O'Rourke v. City of Norman*, 875 F.2d 1465, 1468 n. 7 (10th Cir.) (indicating that this *dicta* applies only to felony arrest warrants), *cert. denied*, 493 U.S. 918, 110 S.Ct. 280, 107 L.Ed.2d 260 (1989). Under the standard of *Payton*, an independent determination of probable cause by a magistrate is not required, and the police officers need only have a reasonable belief that the subject of the arrest warrant both resides at the dwelling and is there at the time they execute the warrant.

The requirement of a reasonable belief also converges with the constitutional standard applicable when police arrest a person based upon a mistake in identity. "A reasonable mistake in identification which leads to an arrest does not violate the arrestee's constitutional rights." *Dean v. City of Worcester*, 924 F.2d 364, 368 n. 4 (1st Cir.1991). This principle was expressed by the Supreme Court in *Hill v. California*, 401 U.S. 797, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971), where the police arrested a person whom they mistook for a person whose arrest was supported by probable cause. The Court held:

> [S]ufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment and on the record before us the officers' mistake

---

**2.** "In the absence of contemporary Tenth Circuit precedent directly concerning the issue, [the court] may look to the law of other circuits when deciding whether or not a right was clearly established." *Morfin v. Albuquerque Public Schools*, 906 F.2d 1434, 1439 (10th Cir.1990). *Accord Salmon v. Schwarz*, 948 F.2d 1131, 1140 n. 9 (10th Cir.1991).

was understandable and the arrest a reasonable response to the situation facing them at the time.

401 U.S. at 804, 91 S.Ct. at 1111. Relying on *Hill,* the Supreme Court has recently reaffirmed that "in order to satisfy the 'reasonableness' requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made by agents of the government ... is not that they always be correct, but that they always be reasonable." *Illinois v. Rodriguez,* 497 U.S. 177, 110 S.Ct. 2793, 2800, 111 L.Ed.2d 148 (1990). *See also Baker v. McCollan,* 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979) (finding no due process violation in the failure of plaintiff's jailors to investigate plaintiff's claims of mistaken identity earlier); *Maryland v. Garrison,* 480 U.S. 79, 88, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987) (under rationale of *Hill,* officer's reasonable mistaken belief that only suspect's apartment occupied third floor of building did not invalidate search pursuant to warrant for entire third floor); *Gero v. Henault,* 740 F.2d 78, 85 (1st Cir.1984) (no constitutional violation for mistaken arrest of person bearing strong resemblance to subject of arrest warrant), *cert. denied,* 469 U.S. 1191, 105 S.Ct. 965, 83 L.Ed.2d 970 (1985); *United States v. Palacios,* 666 F.Supp. 113 (S.D.Tex.1987) (suppressing evidence seized pursuant to arrest of wrong person where mistake in identity was not reasonable).

A similar factual situation was considered by the court in *Ruiz v. Herrera,* 745 F.Supp. 940 (S.D.N.Y.1990). In that case police accompanied a bondsman to a local night club where, the bondsman claimed, his fugitive principal would be found. The police made no effort to verify the bondsman's claim; were in possession of the fugitive's photograph that bore no resemblance to plaintiff; and allegedly did not allow plaintiff to produce identification that would have established the mistake in identity. The court ruled that the mere fact that the bondsman was correct about the existence of a warrant did not eliminate police duty to inquire into the basis of bondsman's claim that the fugitive would

be found in particular place. *Id.* at 950. Accepting plaintiff's version of the facts, the court found that it could not be objectively reasonable for the police officers to believe that plaintiff was the fugitive. *Id.*

Defendants argue, however, that their conduct can be considered, at most, merely negligent, and that liability under § 1983 is therefore foreclosed under the Supreme Court's holding in *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). In *Daniels,* a prisoner sued prison officials for injuries alleged to have been caused by the negligence of a guard who left a pillow on the stairs of the prison. The Court held that the due process clause of the Fourteenth Amendment is not implicated by merely negligent acts causing loss of or injury to life, liberty, or property. *See also Davidson v. Cannon,* 474 U.S. 344, 347, 106 S.Ct. 668, 670, 88 L.Ed.2d 677 (1986) (failure to quickly respond to prisoner's written request).

Defendants' reliance on *Daniels* is misplaced. *Daniels* only concerns situations in which the state actor inadvertently causes a deprivation of the life, liberty, or property when the actor had no intention of causing any deprivation to anyone. *See Daniels,* 474 U.S. at 334, 106 S.Ct. at 666 (if prison officials deprive inmate of good time credit without adequate procedural protections, "the relevant action of the prison officials ... is their deliberate decision to deprive the inmate of good-time credit, not their hypothetically negligent failure to accord him the procedural protections of the Due Process Clause"). By contrast, a state actor who intends the consequences of his actions is held to the qualified immunity standard of objective reasonableness in light of clearly established law. Thus, in *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), where police officers also mistakenly entered a house in search of a fugitive and detained its occupants, the Court held that qualified immunity turns upon "the objective (albeit fact-specific) question whether a *reasonable* officer could have believed [the] warrantless search to be lawful, in light of clearly established law and the information

**1519**

the searching officers possessed." *Id.* at 641, 107 S.Ct. at 3040 (emphasis added). *See also Brower v. County of Inyo,* 489 U.S. 593, 596, 109 S.Ct. 1378, 1381, 103 L.Ed.2d 628 (1989) (for § 1983 claims alleging Fourth Amendment violations, "[a] seizure occurs even when an unintended person or thing is the object of the detention or taking," citing *Hill v. California,* 401 U.S. 797, 802–05, 91 S.Ct. 1106, 1110–11, 28 L.Ed.2d 484 (1971)).

In this case, it is the *deliberate* decision of defendants to enter plaintiff's house and detain him at gunpoint that satisfies the requirement that state action be intentional and not merely negligent before liability under § 1983 may attach. Under the holdings of *Harlow* and *Creighton,* the only question is whether defendants could reasonably believe that their intentional exercise of state authority was consistent with constitutional limitations.

Defendants also argue that a showing of "reckless disregard" or "gross neglect" is required under the Supreme Court's holding in *Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). In *Malley* the Court held that qualified immunity is available to officers who execute a warrant that is not supported by probable cause if the police conduct could nonetheless be deemed constitutional under the suppression hearing standards of *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). That is, "[o]nly where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable will the shield of immunity be lost." *Malley,* 475 U.S. at 344–45, 106 S.Ct. at 1097–98 (citation omitted).

The court finds the holding of *Malley* to be inapplicable in this case. Unlike the factual circumstances presented to the Court in *Leon* and *Malley,* the terms of this warrant did not authorize either the arrest of this plaintiff or the entry of his house. Rather, the arrest warrant only authorized the arrest of the fugitive "James Bailey," whose name is shared by this plaintiff. In accordance with *Payton v. New York,* this arrest warrant allowed defendants to enter any house—without an additional probable cause determination by a magistrate—subject to the requirement of a *reasonable* belief that the fugitive Bailey both resided at the house and was present at that time. Thus, "[t]his is not a circumstance where the officer is relying on the probable cause determination of a magistrate. The police officer is the sole actor whose objective reasonableness is at issue." *Dixon v. Richer,* 922 F.2d 1456, 1463 n. 4 (10th Cir.1991). Because no magistrate intervened to determine whether probable cause existed to enter plaintiff's house, qualified immunity in this case does turn upon the existence of a "reckless disregard of the truth," *Leon,* 468 U.S. at 923, 104 S.Ct. at 3421, "gross incompetence or neglect of duty." *Malley,* 475 U.S. at 346 n. 9, 106 S.Ct. at 1097 n. 9.

"In general, even though conduct is 'unreasonable' under the Fourth Amendment, because of 'the difficulty of determining whether particular searches or seizures comport with the Fourth Amendment,' such conduct may nevertheless be objectively reasonable for purposes of qualified immunity." *Dixon,* 922 F.2d at 1463 (quoting *Creighton,* 483 U.S. at 644, 107 S.Ct. at 3041). Thus, in accordance with the holding of *Creighton,* the objective, fact-specific question on which qualified immunity turns is whether, in light of all the information possessed, an officer reasonably *could* have believed that the fugitive subject of the arrest warrant both resided at this residence at was present at the time the warrant was executed.

Applying these standards, and accepting plaintiff's version of the disputed facts, the court finds that reasonable officers could have believed the fugitive to have been at plaintiff's residence. Officers Haynes and Wiley independently verified that the person residing at 518 S. Glendale was one James D. Bailey. They could reasonably have relied on the representations of Kenney and Greenfeather that a person had been seen entering the house and was in fact home at that time, as indicated by the movement within the house. Although plaintiff's neighbor did not believe that the photo of the fugitive was plaintiff, the

neighbor also stated that he was uncertain. Finally, the failure of the person within the house to respond to the knocks at the door, accompanied by the announcement that they were police officers, could reasonably have been interpreted as an attempt to evade apprehension. In order to deny defendants qualified immunity, " '[i]t is not enough that the court concludes that a violation *arguably* occurred. Rather, the court must be certain that if the facts alleged by plaintiff are true, notwithstanding any credibility disputes with defendants, *then* a violation has clearly occurred.' " *Archer v. Sanchez*, 933 F.2d 1526, 1530 (10th Cir.1991) (emphasis in original, quoting *Connelly v. Comptroller of the Currency*, 876 F.2d 1209, 1212 (5th Cir.1989)). Considering all the information available to the officers, the court concludes that reasonable officers could disagree as to whether the fugitive Bailey was within the house. Accordingly, both Haynes and Wiley are entitled to qualified immunity from suit in the § 1983 action.

With the dismissal of plaintiff's federal claims against the police officers, there is no basis for exercising pendent jurisdiction over plaintiff's state claims against these individuals. *See Thatcher Enters. v. Cache County Corp.*, 902 F.2d 1472, 1478 (10th Cir.1990); *see also Aldinger v. Howard*, 427 U.S. 1, 17, 96 S.Ct. 2413, 2421, 49 L.Ed.2d 276 (1976) (pendent party jurisdiction not cognizable under § 1983). The court will therefore dismiss the state claims against Haynes and Wiley without prejudice. *See Bath v. National Ass'n of Intercollegiate Athletics*, 843 F.2d 1315, 1317 (10th Cir.1988) (dismissal of pendent state claims not on the merits must be without prejudice).

### III. *Liability of the City*

 Qualified immunity is unavailable to municipalities and other governmental agencies sued under § 1983. *Owen v. City of Independence*, 445 U.S. 622, 638, 100 S.Ct. 1398, 1409, 63 L.Ed.2d 673 (1980);

*Ross v. Neff*, 905 F.2d 1349, 1355 (10th Cir.1990). The City, however, may not be held liable under a theory of respondeat superior for the constitutional torts of its employees. *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978). Rather, municipal liability under § 1983 will lie only when the deprivation of rights has been caused by an illegal policy or custom of the municipality, *e.g.*, *Summers v. Utah*, 927 F.2d 1165, 1170 (10th Cir. 1991), or by a single illegal act taken by a public official with final policymaking authority over the subject matter of alleged deprivation. *Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989); *Meade v. Grubbs*, 841 F.2d 1512, 1529 (10th Cir. 1988). However, "[i]f a challenged policy is not unconstitutional in itself, a single incident of unconstitutional activity will not expose a municipality to liability." *Munz v. Ryan*, 752 F.Supp. 1537, 1548 (D.Kan. 1990). *See also Lusby v. T.G. & Y. Stores, Inc.*, 796 F.2d 1307, 1309 (10th Cir.1986).

Plaintiff alleges that the City is liable for its policy of assisting bail bondsmen in apprehending their fugitive principals. Plaintiff fails to allege how this policy can be deemed illegal.[3] Because plaintiff makes no allegation that the City policy itself violates federal law, the City may not be held accountable for any arguable violation of plaintiff's federal rights.

### IV. *Liability of Bail Bondsman*

Defendant Kenney moves for summary judgment on plaintiff's § 1983 claims under several alternative theories: (1) Kenney did not act under color of state law; (2) Kenney is entitled to qualified immunity; (3) plaintiff suffered no constitutional injury; and (4) plaintiff has an adequate remedy under state law that precludes relief under § 1983.

---

**3.** The Supreme Court has expressly recognized that "inadequate training" may constitute an illegal policy or custom for purposes of governmental liability under § 1983. *See City of Can-*

*ton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989). Plaintiff does not allege, however, that the City policy of assisting bail bondsmen is constitutionally deficient.

## A. *Action Under Color of State Law*

■ A necessary predicate to § 1983 liability is that the individual alleged to have violated plaintiff's federal rights did so under color of state law. *E.g., Quezada v. County of Bernalillo,* 944 F.2d 710, 714 (10th Cir.1991). Kenney maintains that the actions he took in this case were those of a private party, and not a state actor.

Whether a private party may be said to have acted under color of state law within the meaning of § 1983 is determined according to the two-part approach set forth in *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982).

> First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible.... Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State.

*Id.* at 937, 102 S.Ct. at 2753–54. Applying this test, the Court held that a private creditor acted under color of state law when, pursuant to state law, the creditor sought and obtained prejudgment attachment of certain property of its debtor.

The first part of the *Lugar* test requires an examination of the source of Kenney's authority to arrest his principal.

Under Kansas law, a bondsman has both a statutory and common law right to arrest his fugitive. *See* K.S.A. § 22–2809 (bondsman authorized to arrest principal and deliver him to court). The nature of the bondsman's common law privilege to arrest was addressed by the Kansas Supreme Court in *State v. Midland Ins. Co.,* 208 Kan. 886, 494 P.2d 1228 (1972):

> Upon entering into a recognizance the defendant, as principal, is in effect released to the surety and is so far placed in the hands of the latter that he may be taken into custody by the surety and surrendered to the court. Thus justice is sought to be afforded both to the accused and to the state.

*Id.* at 889, 494 P.2d 1228 (citations omitted). In *State v. Indemnity Ins. Co. of N. Am.,* 9 Kan.App.2d 49, 670 P.2d 1369 (1983), *review denied,* 234 Kan. 1077 (1984), the Kansas Court of Appeals also noted the arrest powers conferred upon bondsmen at common law:

> By recognizance the principal is, in the theory of the law, committed to the custody of the sureties as to jailers of his own choosing, not that he is, in point of fact, in this country at least, subjected or can be subjected by them to constant imprisonment; but he is so far placed in their power that they may at any time arrest him upon the recognizance and surrender him to the court and, to the extent necessary to accomplish this, may restrain him of his liberty.

*Id.* 9 Kan.App.2d at 56, 670 P.2d 1369 (quoting *Reese v. United States,* 76 U.S. (9 Wall.) 13, 21, 19 L.Ed. 541 (1869)).

The most frequently quoted exposition of the bondsman's common law arrest powers was set forth by the Supreme Court in *Taylor v. Taintor,* 83 U.S. (16 Wall.) 366, 21 L.Ed. 287 (1872):

> When bail is given, the principal is regarded as delivered to the custody of his sureties. Their dominion is a continuation of the original imprisonment. Whenever they choose to do so, they may seize him and deliver him up in their discharge, and if that cannot be done at once, they may imprison him until it can be done. They may exercise their rights in person or by agent. They may pursue him into another State; may arrest him on the Sabbath, and, if necessary, may break and enter his house for that purpose. The seizure is not made by virtue of due process. None is needed. It is likened to the rearrest by the sheriff of an escaping prisoner.

*Id.* at 371. *See also Carlson v. Landon,* 342 U.S. 524, 547, 72 S.Ct. 525, 537, 96 L.Ed. 547 (1952) ("When a prisoner is out on bond he is still under court control, though the bounds of his confinement are enlarged. His bondsmen are his jailers.").

The court finds the first element of *Lugar* to be satisfied in this case. When Kenney made his forced entry into plaintiff's home and detained plaintiff, he acted pursuant to a statutory and common law privilege granted by Kansas law.

The second element of *Lugar* requires that "the party charged with the deprivation ... be a person who may fairly be said to be a state actor," which element may be satisfied where this party "has acted together with or has obtained significant aid from state officials,...." 457 U.S. at 937, 102 S.Ct. at 2754. This principle was stated in *Dennis v. Sparks*, 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980), where the Court found that private parties had acted under color of state law by conspiring with a judge to deprive plaintiffs of a property interest:

> [T]o act "under color of" state law for § 1983 purposes does not require that the defendant be an officer of the State. It is enough that he is a willful participant in joint action with the State or its agents. Private persons, jointly engaged with state officials in the challenged action, are acting "under color" of law for purposes of § 1983 actions.

449 U.S. at 27–28, 101 S.Ct. at 186.

In *Jackson v. Pantazes*, 810 F.2d 426 (4th Cir.1987), a bondsman enlisted the aid of a police officer in making a forced entry into the home of the parents of a fugitive. Although the bondsman actually conducted the search, the police officer lent his authority to gain entrance to the house; helped drag the mother of the fugitive from the doorway; stood by while the bondsman used force against the mother; and informed the mother that the bondsman could "do whatever he wants." Applying the standards of *Lugar*, the court held that the bondsman acted under color of state law because he had obtained significant aid from the police officer and thus acted jointly with this public official. *Id.* at 429. *See also Hill v. Toll*, 320 F.Supp. 185 (E.D.Pa.1970).

Defendant cites to *Ouzts v. Maryland Nat'l Ins. Co.*, 505 F.2d 547 (9th Cir.1974) (en banc), *cert. denied*, 421 U.S. 949, 95 S.Ct. 1681, 44 L.Ed.2d 103 (1975), where the court found no state action on the part of a bail bondsman. The decision in *Ouzts*, however, was premised on a finding that the bondsman had flouted the statutory procedures required of bondsmen under California law, and indeed that state law "expressly condemned and criminalized" the bondsman's conduct in that case. Nor did the bondsman in *Ouzts* apprehend his fugitive with the assistance of police officers. *See Curtis v. Peerless Ins. Co.*, 299 F.Supp. 429, 435 (D.Minn.1969) (no state action for bondsmen who apprehended their principal without assistance of peace officers); *accord Thomas v. Miller*, 282 F.Supp. 571, 573 (E.D.Tenn.1968).

Defendant also relies on decisions from this Circuit finding no state action for a citizen's arrest. In *Lee v. Town of Estes Park*, 820 F.2d 1112 (10th Cir.1987) a private party made a "citizen's arrest" of a person whom he suspected of looting. The private party transported the suspect to the police station, where the suspect was questioned and ultimately charged with disorderly conduct. Subsequently, the suspect sued the private party under § 1983 action. The court rejected the argument that the private party acted jointly with the police, stating the *Lugar* does not apply "where a private party is simply reporting suspected criminal activity to state officials who then take whatever action they believe the facts warrant." 820 F.2d at 1115. *See also Carey v. Continental Airlines, Inc.*, 823 F.2d 1402, 1404 (10th Cir.1987) (no state action for private party who complains to police, who then arrest plaintiff).

Kenney's reliance on these citizen's arrest cases is misplaced. The actions of Kenney were not simply those of a private citizen unilaterally taking action or reporting suspected criminal activity to the police. Rather, the undisputed evidence establishes that Kenney and the police officers acted in a concerted manner to enter the house and restrain plaintiff of his liberty. Moreover, there are allegations allowing the inference that the police officers actually acted under the direction of Kenney, who informed Haynes and Wiley that they

could enter and search for bond forfeitures and that this was done all the time. *See Lusby v. T.G. & Y. Stores, Inc.*, 749 F.2d 1423, 1430 (10th Cir.1984) (jury could find that security guard acted under color of state law where local police followed custom allowing guard to substitute his judgment for that of police), *cert. denied in part, granted in part as to other party*, 474 U.S. 818 & 805, 106 S.Ct. 65 & 40, 88 L.Ed.2d 53 & 33 (1985).

For purposes of this summary judgment motion,[4] the court finds the second prong of *Lugar* to be satisfied. In contrast to *Ouzts*, no party in this case contends that Kenney acted ultra vires the law of Kansas, which grants bondsmen the full extent of their broad common law powers of arrest. Moreover, Kenney's attempts to minimize the assistance given by the police officers in this case are unpersuasive. Together with Kenney, Lt. Haynes and Officer Wiley used their show of authority in an attempt to bring plaintiff to the door; they jointly forced their entry into the house with guns drawn; they pointed their weapons at plaintiff when he appeared; and they jointly restrained plaintiff of his freedom while questioning him. The active, concerted action of the police with Kenney belies Kenney's assertion that the police officers only "stood by" to assist a private action.

Accordingly, the court finds sufficient facts from which a jury could find that Kenney acted under color of state law for § 1983 purposes.

### B. *Availability of Qualified Immunity*

 Kenney argues alternatively that he, like the police officers in this case, is entitled to qualified immunity from suit.

The Supreme Court has yet to address whether qualified immunity is available to private parties who have acted under color of state law. *See Lugar v. Edmondson*

*Oil Co.*, 457 U.S. 922, 942 n. 23, 102 S.Ct. 2744, 2756 n. 23, 73 L.Ed.2d 482 (1980) (reserving issue)[5]. The Tenth Circuit considered this issue, however, in *DeVargas v. Mason & Hanger-Silas Mason Co.*, 844 F.2d 714 (10th Cir.1988), where a visually-impaired individual sued a private corporation that provided security for the Los Alamos National Laboratory. The Laboratory operated under an agreement between the United States Department of Energy ("DOE") and the Regents of the University of California. The Laboratory denied plaintiff's application for employment, relying on a DOE regulation that disqualified "one-eyed individuals" from security inspector duties. The court granted the corporation qualified immunity, holding "that when private party defendants act in accordance with the duties imposed by a contract with a governmental body, perform a governmental function, and are sued solely on the basis of those acts performed pursuant to contract, qualified immunity is proper." *Id.* at 722 (footnotes omitted). *See also Rios v. Cessna Finance Corp.*, 488 F.2d 25, 28 (10th Cir.1974) (denying recovery under § 1983 against creditor who in good faith relied upon unconstitutional replevin statute).

In *DeVargas* the court noted that "[t]he Supreme Court instructs courts to examine the function of individual defendants—the nature of the individual responsibilities—not their status, in resolving immunity defenses." 844 F.2d at 722 (citing *Forrester v. White*, 484 U.S. 219, 108 S.Ct. 538, 545, 98 L.Ed.2d 555 (1988); *Cleavinger v. Saxner*, 474 U.S. 193, 201, 106 S.Ct. 496, 500, 88 L.Ed.2d 507 (1985)). *See also Anthony v. Baker*, 955 F.2d 1395, 1398 (10th Cir. 1992). Under this functional approach, the court must

> examine the nature of the functions with which a particular official or class of officials has been lawfully entrusted, and

---

4. Plaintiff does not argue as a matter of law that Kenney acted under color of state law. Accordingly, the court expresses no view at this time whether "material facts exist without substantial controversy" that would remove this matter from the jury's consideration. *See* Fed.R.Civ.P. 56(d).

5. The court notes that the Supreme Court has granted certiorari and heard oral argument on this issue in the case of *Wyatt v. Cole*, 928 F.2d 718 (5th Cir.1991), *cert. granted*, ── U.S. ──, 112 S.Ct. 47, 116 L.Ed.2d 25 (1991).

[must] seek to evaluate the effect that exposure to particular forms of liability would likely have on the appropriate exercise of those functions. Officials who seek exemption from personal liability have the burden of showing that such an exemption is justified by overriding considerations of public policy,....

*Forrester*, 108 S.Ct. at 542. The policy reasons underlying the decision to grant a particular state actor qualified immunity were also summarized in *DeVargas:*

(1) the injustice of making defendants personally liable merely for performing their duties, (2) the concern that the lack of qualified immunity would render public officials overcautious in their jobs, and (3) the difficulty of attracting qualified persons into public service were immunity not available.

844 F.2d at 723. *See also Duncan v. Peck*, 844 F.2d 1261, 1264–66 (6th Cir.1988) (denying qualified immunity in all cases involving private party acting under color of state law); *Wyatt v. Cole*, 928 F.2d 718, 721 n. 4 (5th Cir.1991) (noting circuit split), *cert. granted*, —— U.S. ——, 112 S.Ct. 47, 116 L.Ed.2d 25 (1991).

With respect to bail bondsmen, the court finds none of the compelling policy reasons that traditionally justify the availability of qualified immunity to state actors performing discretionary functions. In contrast to the defendants in *DeVargas*, Kenney did not act pursuant to a government contract. Nor did Kansas law *require* Kenney to act as he did—a factor present in *DeVargas* that the court found to be significant. 844 F.2d at 721. Rather, the law merely *permits* bail bondsmen to arrest their fugitives who skip bond; it does not entrust bail bondsmen with any public function that is not concurrently retained by the official agents of the state. The court recognized this in *Ouzts v. Maryland Nat'l*

Ins. Co., 505 F.2d 547 (9th Cir.1974) (en banc), *cert. denied*, 421 U.S. 949, 95 S.Ct. 1681, 44 L.Ed.2d 103 (1975), and rejected the argument that a bail bondsman is somehow "an arm of the court." *Id.* at 554. As the court noted in *Ouzts*, "the bail bondsman is in the business in order to make money and is not acting out of a high-minded sense of devotion to the administration of justice." 505 F.2d at 555. *See also Duncan*, 844 F.2d at 1264 (private party is governed only by self-interest and is not invested with public interest responsibilities). The court is also confident that the economic incentives of providing bond are sufficient to ensure an ample number of qualified persons willing to assume the occupational risks of apprehending fugitives—including the risk of liability for unlawful arrests. Even assuming that bail bondsmen performed some necessary public function, the court does not believe that denying qualified immunity would unduly inhibit their enthusiasm to continue in their chosen profession.[6]

The court concludes that qualified immunity is unavailable to Kenney for any actions undertaken in violation of plaintiff's right against unreasonable searches and seizures.

 Because Kenney is not entitled to qualified immunity, his liability depends upon the existence of an actual constitutional violation. *See Specht v. Jensen*, 832 F.2d 1516, 1523 (10th Cir.1987) (objective reasonableness of official action does not resolve whether constitutional violation occurred), *aff'd in part and rev'd on other ground*, 853 F.2d 805, *cert. denied*, 488 U.S. 1008, 109 S.Ct. 792, 102 L.Ed.2d 783 (1988). As a state actor, Kenney is held to the same constitutional standards that constrain the conduct of the police in this case.[7] *See Creighton*, 483 U.S. at 643, 107

---

**6.** Kenney makes no claim that Kansas law provides him with governmental immunity from plaintiff's state law claims. *See generally* K.S.A. § 75–6104 (1989); *Siple v. City of Topeka*, 235 Kan. 167, 679 P.2d 190 (1984).

**7.** Under K.S.A. § 22–2809, Kenney was authorized to arrest his principal and deliver him to a custodial officer of the court. Because Kenney

acted under color of state law, however, his liability under § 1983 must be measured according to federal law. Authority under state law to arrest is no shield against § 1983 liability for an arrest that violates the Fourth Amendment's prohibition against unreasonable searches and seizures. *Martin v. Board of County Comm'rs of Pueblo County*, 909 F.2d 402, 405 n. 3 (10th Cir.1990); *Munz v. Ryan*, 752 F.Supp.

S.Ct. at 3041 (whether a state actor violates a person's federal rights does not turn upon the nature of that actor's duties). Thus, Kenney's liability under § 1983 is judged under the Fourth Amendment standard of reasonableness. *See Curtis v. Peerless Ins. Co.*, 299 F.Supp. 429, 435 (D.Minn.1969) (in § 1983 case, "[s]o long as the bounds of reasonable means needed to effect the apprehension are not transgressed, and the purpose of the recapture is proper in light of the surety's undertaking, sureties will not be liable for returning their principals to proper custody."); *accord Smith v. Rosenbaum*, 333 F.Supp. 35, 39 (E.D.Pa.1971), *aff'd*, 460 F.2d 1019 (3d Cir.1972); *Thomas v. Miller*, 282 F.Supp. 571, 573 (E.D.Tenn.1968).[8]

▆ For Fourth Amendment purposes, "[w]hat is reasonable, of course, 'depends on all the circumstances surrounding the search or seizure and the nature of the search or seizure itself.'" *Skinner v. Railway Labor Executives Ass'n*, 489 U.S. 602, 109 S.Ct. 1402, 1414, 103 L.Ed.2d 639 (1989) (quoting *United States v. Montoya de Hernandez*, 473 U.S. 531, 537, 105 S.Ct. 3304, 3308, 87 L.Ed.2d 381 (1985)). Moreover, in the absence of qualified immunity in § 1983 actions, the legality of a particular search or seizure under the Fourth Amendment is normally a question for the finder of fact. *See DeLoach v. Bevers*, 922 F.2d 618, 623 (10th Cir.) (this Circuit has "long recognized that it is a jury question in a civil rights suit whether an officer had probable cause to arrest"), *cert. denied*, —— U.S. ——, 112 S.Ct. 65, 116 L.Ed.2d 41 (1991); *Bryant v. Whalen*, 759 F.Supp. 410, 417 (N.D.Ill.1991); *cf. Valdez*

*v. Black*, 446 F.2d 1071, 1078 (10th Cir. 1971) (whether search was supported by probable cause is question for court if the material facts underlying a § 1983 claim are not in dispute), *cert. denied*, 405 U.S. 963, 92 S.Ct. 1167, 31 L.Ed.2d 238 (1972); *Draeger v. Grand Central, Inc.*, 504 F.2d 142, 144 (10th Cir.1974).

The court finds that the facts as alleged by plaintiff are sufficient to raise a genuine issue of fact regarding the reasonableness of Kenney's efforts to determine that the fugitive Bailey both resided at plaintiff's house and was present at the time of the forcible entry into plaintiff's home. Because the court cannot say as a matter of law that Kenney acted reasonably under the circumstances, summary judgment is inappropriate.

### C. *Existence of Constitutional Injury*

▆ Kenney notes that plaintiff sustained no physical injury and saw no psychologist. Thus, Kenney argues that plaintiff did not suffer any injuries actionable under § 1983.

Compensatory damages under § 1983 are determined according to the principles of common law tort, which allows recovery of compensatory damages only for actual losses or injuries. *Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 306–07, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986); *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). "[C]ompensatory damages may include not only out-of-pocket loss and other monetary harms, but also such injuries as 'impairment of reputation ..., personal humiliation, and mental anguish and suffering.'"

1537, 1543 (D.Kan.1990); *See also Garcia v. Miera*, 817 F.2d 650, 657 n. 9 (10th Cir.1987) ("'[c]onduct that is wrongful under section 1983 cannot be immunized by state law'"), *cert. denied*, 485 U.S. 959, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988).

**8.** The Fourth Amendment limitation of reasonableness in making the arrest of a fugitive parallels the common law restriction on the broad arrest powers of bondsmen. *See Lopez v. McCotter*, 875 F.2d 273, 277 (10th Cir.) (Cases "relying on the 'if necessary' qualification in *Taylor*, have decided that the common law right of recapture is limited by the reasonable means

necessary to effect rearrest."), *cert. denied*, 493 U.S. 996, 110 S.Ct. 549, 107 L.Ed.2d 546 (1989); *State v. Portnoy*, 43 Wash.App. 455, 718 P.2d 805, 811 (1986) (bondsman may not sweep from his path third parties who he thinks are blocking his search); *Bennett v. State*, 169 Ga.App. 85, 311 S.E.2d 513, 515 (1983) (bondsman, like police officers, may use only such force as is reasonably necessary to effect arrest); *Livingston v. Browder*, 51 Ala.App. 366, 285 So.2d 923 (1973) (bondsman could reasonably enter premises of third person where bondsman knew fugitive was on premises and announced his purpose).

*Stachura,* 477 U.S. at 307, 106 S.Ct. at 2543 (quoting *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 350, 94 S.Ct. 2997, 3012, 41 L.Ed.2d 789 (1974)). In appropriate circumstances, presumed actual damages may also be appropriate. *Id.* 477 U.S. at 311, 106 S.Ct. at 2545. Moreover, even in the absence of an actual loss, nominal damages are available under § 1983. *Wolfenbarger v. Williams,* 774 F.2d 358, 362 (10th Cir. 1985), *cert. denied,* 475 U.S. 1065, 106 S.Ct. 1376, 89 L.Ed.2d 602 (1986).

Kenney's argument is not well taken. Regardless of the extent of plaintiff's injuries, proof of an illegal search and seizure would entitle plaintiff to recover damages under § 1983—if only nominal damages. Section 1983 does not impose a jurisdictional minimum amount of damages. *Hill v. McIntyre,* 884 F.2d 271, 278 (6th Cir.1989).

Contrary to Kenney's assertion, *Jackson v. Pantazes,* 810 F.2d 426 (4th Cir.1987) does not stand for the proposition that excessive force in apprehending the bondsman's fugitive must be shown before plaintiff may state a claim under § 1983. In *Pantazes* a bondsman and a police officer acted jointly to force their way into the house of a fugitive's parents, and—while the police officer physically restrained the mother—the bondsman conducted a search using allegedly excessive force. Kenney fails to appreciate that the requirement of reasonableness in apprehending a fugitive applies not only to the manner in which the entry and arrest is carried out, but also to the very act of entry and arrest. Acceptance of Kenney's argument would allow a bondsman to enter any house and arrest its occupants, without regard to the reasonableness of the bondsman's belief that his principal is located within, as long as "excessive force" did not accompany the entry and arrest. By definition, the forced entry into a house is unreasonable if the bondsman cannot reasonably believe his principal to be found there.

**9.** *Daniels* held that negligent deprivation of property by state actors can never constitute a due process violation—regardless of the avail-

### D. *Adequate Remedy Under State Law*

 Kenney's final challenge to the § 1983 claims is that Kansas provides an adequate remedy for plaintiff's injuries, and that recovery is therefore foreclosed under the holding of *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). In *Parratt,* which was partially overruled by *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986),[9] the Court held that an adequate remedy in state tort law for a negligent deprivation of property constitutes the due process required by the Fourteenth Amendment. Contrary to Kenney's assertion, however, *Parratt* does not make the availability of a constitutional remedy dependent upon the absence of other state remedies. Rather, *Parratt* merely recognized that in the context of substantive due process violations, the existence of an adequate post-deprivation remedy under state law constitutes the due process required by the federal constitution. That is, no substantive due process violation occurs when state law itself provides a remedy for the deprivation. *Parratt* does not support the proposition that the mere existence of alternate state remedies suspends relief otherwise available under § 1983 for deprivation of a federal right.

### V. *Pendent State Claims*

Because the court has determined that plaintiff has a viable § 1983 claim against Kenney, the court will exercise pendent jurisdiction over plaintiff's state claims against Kenney. *See, e.g., United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1963). Kenney moves for summary judgment on three of plaintiff's state law claims.

### A. *Outrageous Conduct*

 The Kansas Supreme Court stated the elements for intentional infliction of emotional distress—or the tort of outrage—in *Moore v. State Bank of Burden,*

ability of adequate post-deprivation remedies under state law.

240 Kan. 382, 729 P.2d 1205 (1986), *cert. denied*, 482 U.S. 906, 107 S.Ct. 2484, 96 L.Ed.2d 376 (1987):

> (1) The conduct of the defendant must be intentional or in reckless disregard of the plaintiff; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between the defendant's conduct and the plaintiff's mental distress; and (4) the plaintiff's mental distress must be extreme and severe.

*Id.* at syl. ¶ 3. In *Taiwo v. Vu*, 249 Kan. 585, 822 P.2d 1024 (1991), the court recently reiterated the two threshold requirements for recovery under the tort of outrage: " '(1) Whether the defendant's conduct may reasonable be regarded as so extreme and outrageous as to permit recovery; and (2) whether the emotional distress suffered by plaintiff is in such extreme degree the law must intervene because the distress inflicted is so severe that no reasonable person should be expected to endure it.' " 249 Kan. at 592, 822 P.2d 1024 (quoting *Roberts v. Saylor*, 230 Kan. 289, 293, 637 P.2d 1175 (1981)).

Plaintiff does not allege that the *manner* in which Kenney conducted the search and seizure—if otherwise legal—was outrageous. Rather, the only conduct alleged to be extreme and outrageous is the very act of entering plaintiff's home and detaining him. Kansas law, however, allowed Kenney to use reasonable means in apprehending his fugitive principal, including—if necessary—breaking and entering the fugitive's home. Thus, Kenney's conduct could be characterized as "extreme and outrageous" only if his investigation was so inadequate "as to go beyond the bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Roberts*, 230 Kan. at 293, 637 P.2d 1175.

The court finds insufficient evidence to permit a jury to conclude that Kenney's conduct was extreme or outrageous. Although the court is not prepared to say as a matter of law that Kenney reasonably believed that his fugitive resided and was present at plaintiff's address, any inadequacies in Kenney's investigation fall far short of conduct that is "outrageous in character" or "extreme in degree." *Roberts*, 230 Kan. at 293, 637 P.2d 1175. Because plaintiff has failed to demonstrate a genuine issue of fact on this essential element, summary judgment will be granted on the claim of intentional infliction of emotional distress.

**B.** *Assault*

■■ Kenney argues that plaintiff has failed to state a claim for assault.

Under Kansas law, "[a]n assault is an intentional threat or attempt, coupled with apparent ability, to do bodily harm to another, resulting in immediate apprehension of bodily harm. No bodily contact is necessary." *Taiwo v. Vu*, 249 Kan. 585, 822 P.2d 1024, syl. ¶ 7 (1991). Kenney maintains that plaintiff was under no threat of immediate harm from *Kenney*—nor could plaintiff reasonably have apprehended such a threat—because the police officers were the only persons who pointed weapons at plaintiff. Kenney recognizes that the law imposes civil liability also on persons who do not directly perform the tortious act:

> Civil liability for an assault and battery is not limited to the direct perpetrator of the act charged; it extends to any person who by any means encourages or incites that act or aids and abets.

6 Am.Jur.2d *Assault and Battery* § 128, at 108 (1970). According to Kenney, however, he cannot be liable for any assault the police officers may have committed because the officers were neither Kenney's agents nor under his control.

The Kansas Supreme Court recently set forth the elements for aiding and abetting in the civil context:

> (1) The party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; and (3) the defendant must knowingly and substantially assist the principal violation.

*State ex rel. Mays v. Ridenhour*, 248 Kan. 919, 811 P.2d 1220, syl. ¶ 3 (1991). The

court construes Kenney's argument as a challenge to the sufficiency of evidence on the third element of aiding and abetting: whether Kenney gave substantial assistance to the police officers. In *Ridenhour* the court directed consideration of the following factors in determining whether defendant's assistance in aiding and abetting a tort was substantial:

> (1) the nature of the act encouraged, (2) the amount of assistance given by the defendant, (3) his presence or absence at the time of the tort, (4) his relation to the other party, (5) his state of mind, and (6) the duration of the assistance provided.

248 Kan. 919, 811 P.2d 1220, syl. ¶ 4.

Viewing the evidence in a light most favorable to plaintiff, and considering the six factors adopted in *Ridenhour*, the jury could reasonably conclude that Kenney's assistance in the alleged assault was substantial. The court has already concluded that there is significant evidence of concerted action between the police and Kenney, *supra* at 1523–1524, and this analysis applies equally to Kenney's present challenge.

### C. *False Imprisonment*

■■■■ Kenney's final argument goes to the sufficiency of plaintiff's claim of false imprisonment.

Kenney correctly states the issue to be whether it was reasonable, under all the circumstances, for defendants to have entered plaintiff's house and detained him at gunpoint. "In an action for false arrest or false imprisonment, all that is necessary is that the individual be restrained of his liberty *without any sufficient legal cause therefor,* and by words or acts which the one being restrained fears to disregard." *Thompson v. General Finance Co.,* 205 Kan. 76, 88, 468 P.2d 269 (1970) (emphasis added).

Under Kansas common law, a "sufficient legal cause" justifying defendants' actions in this case is the bondsman's privilege of using the reasonable means necessary for apprehending his principal—which privilege includes actions based upon reasonable mistakes in identity. *See supra,* note 8

and accompanying text; *see also Alvarado v. City of Dodge City,* 238 Kan. 48, 62, 708 P.2d 174 (1985) (to establish merchant's defense to false arrest, jury must decide whether security officer had probable cause to believe plaintiff had stolen property and whether plaintiff was detained in reasonable manner and time period). Unlike Kenney, however, the court is unable to say as a matter of law that defendants' mistake was reasonable.

### VI. *Conclusion*

The court finds that the police officers sued in their individual capacity are entitled to qualified immunity. Moreover, the absence of any illegal action attributable to the City mandates dismissal of the federal claims against the City. The court finds, however, that triable issues remain with respect to the § 1983 claims against defendant Kenney. With the exception of plaintiff's claim for intentional infliction of emotional distress, the court also finds that triable issues of fact remain with respect to plaintiff's state law claims.

Accordingly, the motion for summary judgment (Doc. 48) of defendants Wiley, Haynes, and the City of Wichita is hereby granted as to all federal claims. The state claims against Wiley, Haynes, and the City of Wichita are hereby dismissed without prejudice. The motion for summary judgment (Doc. 52) of defendant Kenney is granted as to the claim for intentional infliction of emotional distress. The motion for summary judgment of defendant Kenney is denied as to all other claims.

IT IS SO ORDERED.