Jrae MASON, Plaintiff,

v.

The CITY OF NEW YORK,
et al., Defendants.

No. 95 Civ. 5331 (LAK).

United States District Court,
S.D. New York.

Dec. 17, 1996.

David Breitbart, Richard M. Rubenstein, Law Office of David Breitbart, New York City, for Plaintiff.

Robert Blossner, New York City, for Defendants Robert Berretta, Berretta Bonds Agency, Inc., and Confidential Inquiries, Inc.

Milton H. Pachter, Stephen E. Powell, New York City, for Defendants Port Authority of New York and New Jersey, Sergeant Kenneth Kohlman, Sergeant Robert Schaefer, and Lieutenant Kenneth Hassett.

## MEMORANDUM OPINION

KAPLAN, District Judge.

In July 1994, the plaintiff, Jrae Mason, was sitting on her stoop in Manhattan when she was approached by two men who believed that she was, or might have been, Audrey White Smith, who had jumped bail in Tuscaloosa, Alabama. This began an ordeal of several days during which Ms. Mason was confined and then taken against her will to Tuscaloosa, where she was released when the Alabama authorities determined that she was not Smith. She brought this action against a number of defendants under 42 U.S.C. § 1983 and on state law theories, in substance for false arrest. The jury returned substantial verdicts in Mason's favor against two related Bronx firms, Confidential Inquiries, Inc. ("CI") and Berretta Bonds Agency, Inc. ("BBA"), which were alleged to have employed the bounty hunter who caused Mason's arrest, and three officers of the police department of the Port Authority of New York and New Jersey, who allegedly acted wrongfully in connection with a portion of Mason's detention. The matter now is before the Court on defendants' post-verdict motions and for a determination of the effect, if any, of a prior settlement of related claims made by the City of New York.

### Facts

The chain of events that led to Mason's arrest and transport to Alabama began with the failure of one Audrey White Smith to appear as required for an Alabama court appearance, whereupon Alabama bondsmen sought to procure her return. Apparently believing that Smith had fled to Manhattan, they enlisted help in New York, although the evidence at trial was far from clear as to whose help they sought. Whatever the route, however, the assignment ultimately went to one Victor Melendez who, from time to time, apprehended defendants who had jumped bail.

Melendez was acquainted with Darren Fuentes and Javier Mulinary, who were interested in getting into the bail enforcement business. He gave them such information as he had and sent them in search of Smith. On July 18, 1994, they came upon Mason sitting in front of her apartment building and thought she might be Smith. Although Mason denied being Smith, she produced a number of different pieces of identification, each bearing a different name. Fuentes and Mulinary then handcuffed her, taking her first to the local New York City Police precinct and then to Bronx Central Booking in an effort to establish her identity. They ultimately were directed to Manhattan Central Booking, and they and Melendez took Mason to that facility.

Melendez took Mason inside and spoke to NYPD personnel. Mason was fingerprinted and the prints were sent to Albany. In the process, an on-line booking sheet, a prisoner transport slip, and other paperwork similar to the documents generated when the NYPD makes an arrest were produced by the NYPD on-line booking system. A civilian employee of the police department testified that after the fingerprint report arrived from Albany, he told Melendez that Mason was not the woman wanted in Alabama, although Melendez in a tape recorded statement received in evidence contended that he was told that Mason "is the one." In any case, Melendez emerged from Manhattan Central Booking with Mason and turned her over once again to Fuentes and Mulinary with instructions to hold her until the Alabama bondsmen arrived in New York to take custody of her.

On the following day, Fuentes, Mulinary and Melendez took Mason to Kennedy Airport to meet the Alabama bondsmen upon their arrival. When the plane was delayed, they took Mason to the Port Authority police

facility. Melendez spoke to Sergeant Robert Schaefer, showed him some papers, the nature of which Schaefer could not remember at trial, and asked to hold Mason there until the flight arrived. Mason was handcuffed to a chair in a conference room for about two hours. Melendez, assisted by Fuentes and Mulinary, then had Mason signed out by Sergeant Kenneth Kohlman, took her to the Avis car rental location, and turned her over to the Alabama bondsmen in exchange for a $4,000 check. At that point, the Alabama bondsmen took her to Alabama where she ultimately was released.

Mason brought this action against the City of New York, the Port Authority, the two Port Authority sergeants, a lieutenant who had been on duty that day, Melendez, Fuentes, Mulinary, Robert Berretta, and the two Bronx companies of which Berretta was the sole stock holder, CI and BBA. In essence, she charged all concerned with false imprisonment. The claim against Berretta, CI and BBA was based on the theory that Melendez had been employed by them and that they were responsible for his actions, as well as those of Fuentes and Mulinary. The City settled before trial for $145,000, and the case went to trial against the Port Authority, its officers, and Berretta and his companies. The fundamental issues at trial were whether the Port Authority officers had acted reasonably and whether Berretta and his companies were responsible for the actions of Melendez, Fuentes and Mulinary.

At the conclusion of the plaintiff's case, the Court granted judgment as a matter of law dismissing the claims against Berretta. The jury returned a special verdict finding: (1) Melendez, Fuentes and Mulinary reasonably believed at the time of Mason's arrest that she was Audrey White Smith, (2) Melendez learned at Manhattan Central Booking that Mason was not Smith, (3) Melendez was an employee of both BBA and CI, (4) Melendez acted within the scope of his employment by both companies when he took Mason into and kept her in custody, (5) each of the three Port Authority officers kept Mason in custody, (6) none of the Port Authority officers reasonably believed that Mason had jumped bail and that Melendez was assisting in re-

turning her to the appropriate court, (7) the amounts that would reasonably compensate Mason for the injury she suffered were (a) $50,000 for the period from Melendez' learning that she was not Smith until her arrival at the Port Authority police facility, (b) $100,000 for the two hour period during which she was held at the Port Authority facility, (c) and $150,000 for the period of days commencing with her departure from the Port Authority facility, and (8) Mason was entitled to punitive damages in the amount of $450,000 as against each of BBA and CI.

### The Motions

BBA and CI now move to vacate the damage awards against them pursuant to FED. R.CIV.P. 50(b) or for a new trial. They argue that they cannot be held liable under 42 U.S.C. § 1983 for the actions of Melendez, Fuentes and Mulinary, even if Melendez was employed by them, because there is no *respondeat superior* liability under Section 1983 and neither BBA nor CI authorized or acquiesced in the tortious conduct.

The Port Authority officers move for judgment as a matter of law or for a new trial. They renew their Rule 50 motion, contending that they are entitled to judgment as a matter of law on the ground of qualified immunity. In the alternative, the Port Authority officers move for a new trial on the ground that the damages are excessive.

The parties agreed to reserve to the Court the effect of the City's $145,000 settlement on the remaining defendants and the apportionment, if appropriate, of liability among the defendants.

### Discussion

#### The BBA–CI Motions

In arguing that there is no *respondeat superior* liability under Section 1983, a well-established proposition, BBA and CI overlook the essential fact that their liability rests equally on state law. Section 1983 affords a cause of action for false imprisonment where the defendants act under color of state law. *See Zanghi v. Incorporated Village of Old Brookville,* 752 F.2d 42, 45 (2d Cir.1985). The elements of the claim, save for the color

of state law requirement, are identical to those of the common law cause of action. *Id.* BBA and CI therefore are liable for the actions of Melendez, Fuentes and Mulinary under the doctrine of *respondeat superior* to whatever extent that doctrine would subject them to liability on the pendent state law claims. The question, therefore, is whether BBA and CI are entitled to judgment on the state law claims.

■ The issue whether Melendez was an employee of the Berretta companies was hotly contested at trial. Berretta claimed that Melendez was an independent contractor. According to Berretta, Melendez was trying to go into business as a bail enforcement agent—a bounty hunter—but lacked sufficient resources to do so on his own. Berretta therefore allowed Melendez to use a desk in his store front in exchange for a promise that Melendez would pay him rent in the future when Melendez got his feet on the ground. Berretta claimed also that he hired Melendez from time to time, on a contingency basis, to find defendants for whom Berretta had procured bail bonds and who had failed to appear as required. The plaintiff, on the other hand, asserted that Melendez was an employee. The evidence, although perhaps thin, was sufficient to warrant submission of the issue to the jury. And the jury specifically found that Melendez was an employee. There is no basis for disturbing that finding.

■ The jury found also that Melendez acted within the scope of his employment with regard to Mason. The plaintiff of course sought to suggest that the assignment to find Smith was an assignment that had come to BBA and CI and that Melendez had been working for them in making the arrest. Berretta denied any such thing, arguing that Melendez somehow had made his own deal with the Alabama bondsmen as part of his efforts to get his independent business off

the ground. Unfortunately for the Berretta entities, however, the parties stipulated into evidence a tape recorded statement made by Melendez, who did not appear at trial, to the NYPD (PX 42A) in which Melendez stated that "the case was initially taken by telephone by one Pat Ritchie, who I believe still works for Berretta Bonding. The case was then assigned to me because it fell within my area of responsibility." He went on to say that he, Fuentes and Mulinary had been acting on behalf of BBA. The credibility of Melendez' statement plainly was for the jury to determine. The evidence therefore was sufficient to support the jury's verdict that Melendez and his associates acted within the scope of Melendez' employment by BBA and CI.[1] In consequence, BBA and CI are liable on the state law claims for Melendez' actions on the theory of *respondeat superior.*

■ The liability of BBA and CI for punitive damages is another matter. It is well established in New York that an employer may be called upon to respond in punitive damages for the malicious acts of its employees "only where management has authorized, participated in, consented to or ratified the conduct giving rise to such damages, or deliberately retained the unfit servant ..." *Loughry v. Lincoln First Bank, N.A.,* 67 N.Y.2d 369, 378, 502 N.Y.S.2d 965, 969–70, 494 N.E.2d 70, 74–75 (1986). While the jury was entitled to find that apprehending Smith was an assignment given by BBA and CI to Melendez, there was no evidence whatsoever that anyone in management authorized, participated in, consented to or ratified Melendez' conduct in continuing to hold Mason and turning her over to the Alabama bondsmen once he learned that Mason was not Audrey White Smith. The only conceivable theory for holding BBA and CI liable for punitive damages—and the only theory submitted to the jury[2]—was that Melendez was unfit and

---

**1.** The jury reasonably could have found that Melendez acted within the scope of his employment even if he departed from Berretta's instructions and the tort Melendez committed was intentional. *Riviello v. Waldron,* 47 N.Y.2d 297, 302, 418 N.Y.S.2d 300, 302, 391 N.E.2d 1278, 1280 (1979); *Quadrozzi v. Norcem, Inc.,* 125 A.D.2d 559, 561, 509 N.Y.S.2d 835, 836–37 (2d Dep't. 1986).

**2.** Neither side requested that the issue whether BBA and/or CI management authorized, participated in, consented to or ratified Melendez' conduct be submitted to the jury, no doubt recognizing that the evidence was insufficient to warrant doing so. Assuming that the record were to be regarded as sufficient to warrant such a finding, however, the Court finds, pursuant to FED.

that BBA and/or CI was actually or constructively aware of that unfitness. (Tr. 763–64)

There was very little evidence at trial concerning the unfitness theory on which the punitive damages claim against the Berretta entities went to the jury. Berretta acknowledged that he did not look into Melendez' background before entering into the arrangement with him (Tr. 186–87), and the jury therefore was entitled to charge his companies with knowledge of anything that such a check would have revealed. Plaintiff's difficulty, however, is that she failed to offer any evidence from which the jury reasonably could have found that Melendez was unfit when Berretta hired him or, for that matter, at any point before the fateful day on which he improperly retained custody of plaintiff after having learned that he had the wrong person. This conclusion, however, does not require that plaintiff's punitive damage claim be dismissed in the present posture of the case. Indeed, the Court lacks the authority to do so in light of the motion that was made at the conclusion of all of the evidence.

■ FED.R.CIV.P. 50(a) permits a party to move for judgment as a matter of law prior to the submission of the case to the jury and requires that such a motion "specify the judgment sought and the law and the facts on which the moving party is entitled to judgment." Rule 50(b) provides that if the Court does not grant the motion, the case is deemed submitted to the jury subject to the Court's later deciding the legal questions raised by the motion and permits renewal of the request for judgment by motion within ten days after the entry of judgment. The critical point is that the post-judgment Rule 50 motion is merely a renewal of the motion made prior to the submission of the case to the jury and therefore is limited to the grounds raised by the losing party in that motion. *Lambert v. Genesee Hospital*, 10 F.3d 46, 53–54 (2d Cir.1993).

Here, the Berretta companies sought judgment as a matter of law at the close of all the evidence on the ground that "Melendez veered from his employment after" learning that plaintiff was not Smith. (Tr. 612–13)

They did not seek judgment on the ground that there was no evidence to support the unfitness theory and, indeed, did not object to the relevant aspect of the charge. (Tr. 620–21, 631) Accordingly, the Court may not grant judgment to the Berretta companies with respect to the punitive damages claim. Nevertheless, their motion seeks a new trial as well. (Blossner Aff. at 4) As the lack of any evidence to support the finding that either BBA or CI was aware of any unfitness of Melendez renders the jury's verdict on this question against the weight of the evidence, that portion of the verdict that finds BBA and CI each liable to plaintiff in the amount of $450,000 for punitive damages is set aside and a new trial of the punitive damage claim against them is ordered. *Oliveras v. American Export Isbrandtsen Lines, Inc.*, 431 F.2d 814, 816–17 (2d Cir.1970).

### The Port Authority Motions

#### Qualified Immunity

At the close of all of the evidence, the Court granted the motion of the Port Authority to dismiss the Section 1983 claim against it on the ground that there was no evidence from which the jury could find the Port Authority liable in light of *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). It granted also the motions of all of the Port Authority defendants to dismiss the punitive damages claims against them because there was no evidence upon which such an award could be grounded. It denied the motion of the three Port Authority officers to dismiss the claims against them on the ground of qualified immunity. It is this latter motion which the Port Authority officers renew. Although brief reference already has been made to the facts concerning the Port Authority police involvement in this matter, somewhat more detail is necessary to deal with these motions.

While Melendez, Mason and the others were awaiting the arrival of the flight at Kennedy Airport, Fuentes suggested that perhaps the Port Authority police would let them use its facility to hold Mason during the interim. (Tr. 270) Melendez and Mulinary

---

R.CIV.P. 49(a), that there was no such authoriza-

tion, participation, consent or ratification.

left Fuentes and Mason. (*Id.*) Shortly thereafter, Sergeant Schaefer received a call from another police officer who advised Schaefer that a bail bondsman with a prisoner had asked whether the Port Authority could lodge the prisoner until they were ready to leave. (Tr. 430) Schaefer told the officer to send them over to the Port Authority police facility and the Port Authority would see what it could do. (*Id.*) He then told a lieutenant, whom the jury found to have been Lieutenant Hassett,[3] of the request and was told to "check it out" and put them upstairs in a conference room. (Tr. 433)

When Melendez, Mason and the others arrived, Melendez spoke with Schaefer and showed him some documents and identification. (Tr. 69–70, 271, 275–78, 435–37) According to Fuentes, the documents were those obtained by Melendez from Manhattan Central Booking, although Schaefer could not remember what he had been shown. (Tr. 275–78, 435–37) Schaefer then showed them to a conference room and logged Mason in as a prisoner, whereupon Melendez or one of his associates handcuffed Mason to a chair. Although there was a conflict in the evidence, the jury was entitled to find that Mason told Schaefer that she was not the person who was wanted. (*See* Tr. 70)

Mason was kept in the conference room for approximately two hours. (Tr. 280) Melendez then said it was time to go, Sergeant Kohlman signed Mason out on the log, and Melendez and the others took Mason out of the facility. (Tr. 74, 280–82, 524–25, 529–33) Thus ended the involvement of the Port Authority police in this incident.

The defense of qualified immunity has been summarized as follows: "Government officials performing discretionary functions are shielded from personal liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Warren v. Dwyer*, 906 F.2d 70, 74 (2d Cir.1990) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). The Second Circuit has added that:

"In determining whether a particular right was clearly established at the time defendants acted, this Court has considered three factors: (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful." *Jermosen v. Smith*, 945 F.2d 547, 550 (2d Cir.1991), cert. denied, 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992).

■ A determination of "rights" under this standard "depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified," as the issue of immunity cannot be resolved by reference to overly general formulations of constitutional rights. *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). There is no question that an individual has a Fourth Amendment right to be free from unreasonable seizure. But that is far too general a statement for meaningful qualified immunity analysis. In light of the jury's finding that the officers did not reasonably believe, based on the information presented by Melendez, that Mason was Audrey White Smith and that Melendez and his associates were assisting in returning her to the appropriate court, the dispositive issue here is whether the Port Authority officers were required to make inquiries as to Mason's identity.

The right in question—an arrestee's right to have her identity checked before or soon after she is incarcerated—was unambiguously and strongly supported by Second Circuit law at the time of the events in question. "[W]here a police officer has or should have doubts whether a detained suspect is in fact the person sought, the officer must make 'immediate reasonable efforts to confirm the suspect's identity.'" *United States v. Valez*, 796 F.2d 24 (2d Cir.1986) (quoting *United States v. Glover*, 725 F.2d 120, 123 (D.C.Cir. 1984)); *United States v. Bautista*, 23 F.3d

---

**3.** Lieutenant Hassett had no memory of the incident. (Tr. 481–82)

726, 730 (2d Cir.1994). Accordingly, *Jermosen*'s first two requirements are met.

The Port Authority officers contest *Jermosen*'s third prong and contend that they are not properly charged with knowledge of Mason's rights in this situation. They claim that the circumstances of this case were sufficiently unusual that a reasonable police officer would not have known that the officers had a duty to take reasonable steps to check Mason's identity. The Court disagrees. Regardless of the circumstances preceding Mason's arrival at the airport, upon entering the Port Authority's custody she was owed at least the same duty as any arrestee.[4] The Court therefore finds that the Port Authority officers violated a clearly established right of which they certainly should have known. Hence, they are not immune from suit under Section 1983.

The officers are liable also under New York law. Police are not immune in New York from intentional tort liability. *Jones v. State of New York*, 33 N.Y.2d 275, 279–80, 352 N.Y.S.2d 169, 171–72, 307 N.E.2d 236, 236–38 (1973). *See Arteaga v. State of New York*, 72 N.Y.2d 212, 220, 532 N.Y.S.2d 57, 61–62, 527 N.E.2d 1194, 1197–99 (1988). More specifically, police are not immune in suits for false arrest or false imprisonment. *See Ross v. Village of Wappingers Falls*, 62 A.D.2d 892, 897, 406 N.Y.S.2d 506, 510 (2d Dep't 1978). Because the jury found that the Port Authority officers committed all of the elements of false imprisonment, the officers are not entitled to immunity on the state law claims.

### The Claim of Excessive Damages

The jury found that the damages to plaintiff were $50,000 for the period from the time of the finger print check at Manhattan central booking until her arrival at the Port Authority facility, $100,000 for the brief peri-od during which she was at the Port Authority facility, and $150,000 for the period from the time when she left the Port Authority facility until she was freed in Alabama a couple of days later. The Port Authority defendants claim that the damages for the second of these periods are excessive.[5]

Because the jury awarded lump sum damages encompassing both the federal and state claims, the Court must determine excessiveness under both federal and state law. Under federal law "[t]he standard of appellate review of damage awards ... 'is whether the award is so high as to shock the judicial conscience and constitute a denial of justice.'" *Ismail v. Cohen*, 899 F.2d 183, 186 (2d Cir.1990). When making this determination under Section 1983, courts should consider both federal and state law awards. *Zarcone v. Perry*, 572 F.2d 52, 54–55 (2d Cir.1978).

Under Section 5501(c) of New York's CPLR, jury awards are considered "excessive or inadequate if [they] deviate materially from what would be reasonable compensation." In applying this test, "New York state courts look to awards approved in similar cases." *Gasperini v. Center for Humanities, Inc.*, — U.S. ——, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996). This standard provides for a narrower range of acceptable awards than its "shocks the judicial conscience" counterpart. *Consorti v. Armstrong World Industries, Inc.*, 72 F.3d 1003, 1013 (1995).

The $100,000 awarded for Ms. Mason's incarceration at the airport for roughly two hours is excessive under both the New York standard and federal law. Plaintiff suffered no physical injuries at the hands of the Port Authority or while in its facility. Her detention there was not visible to the public, circumscribing the humiliation resulting from her treatment. It is immediately apparent

---

**4.** A police officer's duty to take reasonable steps to verify an arrestee's identity is not lessened by the fact that a civilian made the initial arrest. *See Ruiz v. Herrera*, 745 F.Supp. 940, 950 (S.D.N.Y.1990) (in distinguishing innocent individual from bail jumper, police officers may not rely on "the word of an unknown bail bondsman."); *Bailey v. Kenney*, 791 F.Supp. 1511, 1518 (D.Kan.1992) (police have duty "to inquire into the basis of bondsman's claim" before assist-ing him). If anything, the police should make greater efforts to verify the identity of a suspect arrested by civilians.

**5.** Although the relevant portion of the Port Authority's brief was entitled "The Damages Are Excessive" (Def.Mem. 8), the argument focuses exclusively on the airport period.

that the magnitude of this award does not comport with precedent, even when previous decisions are adjusted for inflation.[6] Accordingly, the plaintiff must agree to a remittitur of all but $10,000 of the $100,000 awarded for the period of incarceration at the airport or the Court will order a new trial on this issue.

### Issues Reserved to the Court

The City of New York and related defendants settled with plaintiff for $145,000. The trial defendants contend that they are entitled to setoff the amount of the City's payment against their liability to the plaintiff. They contend also that liability should be apportioned among them, the settling defendants, and the defendants against whom default judgments have been entered.[7] They have stipulated that the Court will resolve these issues without a jury and make any findings of fact necessary to do so. (Tr. 637–42).

### Setoff

In addressing the claimed setoff of the City's settlement, it is necessary to consider, first, the divisibility of the settlement from the liability of the nonsettling tortfeasors and, second, the availability of setoff to intentional tortfeasors.

Plaintiff contends that the New York City settlement "was predicated on different damages" than the jury awards covering the three time periods and consequently there should be no setoff of the City's $145,000 settlement against the other defendants' liabilities. For setoff to apply under state law "[a]ll that is required is that [tortfeasors] be subject to liability for damages for the same injury." *Roma v. Buffalo General Hospital,*

103 A.D.2d 606, 608, 481 N.Y.S.2d 811, 812 (3d Dep't.1984). A similar standard is applicable under federal law, which governs the Section 1983 claims. *United States v. Alcan Aluminum Corp.,* 990 F.2d 711, 722 (2d Cir. 1993).

The plaintiff's injury in this case was her false imprisonment. Her detention resulted from the actions of the City and the bondsmen from the time her fingerprints were checked at Manhattan Central Booking until her arrival at the airport and from the actions of the bondsmen, the City and the Port Authority and their agents for both of the subsequent periods. In each of these three periods Mason suffered a single injury, the deprivation of her freedom, which cannot be fractionalized.

Here, Melendez, and therefore CI and BBA, was a causative factor in all three periods of wrongful detention. The City settled a claim alleging that it was responsible for plaintiff's detention from the moment the fingerprint check was done at Manhattan Central Booking,[8] so it too was a causative factor in all three periods. The Port Authority defendants were a causative factor in Mason's detention only from the moment of her arrival at the Port Authority facility until she was released in Alabama, *viz.* the last two periods. In consequence, the claim that the City settled was for the same injuries for which the defendants in this case were held liable at trial, although the extent to which particular defendants will benefit from the City's settlement varies depending upon the allocation of the settlement among the relevant time periods.

---

**6.** Applying the less easily satisfied "shocks the conscience standard," the Second Circuit reversed a $150,000 award for eight hours of false imprisonment, giving the plaintiff the choice between a new trial or $50,000. *Gardner v. Federated Dep't Stores, Inc.,* 907 F.2d 1348 (2d Cir. 1990). *Gardner* also mentions a number of other New York false imprisonment damage awards, ranging from $50,000 for 12 hours of incarceration and significant humiliation to $7,500 for five hours of custody. *Gardner,* 907 F.2d at 1353 (discussing *Malte v. New York,* 125 A.D.2d 958, 510 N.Y.S.2d 353 (4th Dep't 1986), and *Woodard v. City of Albany,* 81 A.D.2d 947, 439 N.Y.S.2d 701 (3d Dep't 1981)). Decisions under federal

law are roughly comparable. *E.g., Velez v. United States,* 693 F.Supp. 51 (S.D.N.Y.1988) (plaintiff received $25,000 for two days of false imprisonment).

**7.** On September 26, 1996 the Court granted a default judgment against Melendez, Mulinary, Bail of Alabama, Inc. and Robert Hall, Jr.

**8.** The Court finds that no part of the City's settlement was attributable to any period prior to the events at Manhattan Central Booking. There is no colorable or persuasive evidence of tortious behavior prior to that point.

■ Whether setoff is available to intentional tortfeasors under New York law is easily answered. Section 15–108 of the General Obligations Law, N.Y.GEN.OBLIG.L. § 15–108 (McKinney 1995), provides in relevant part that a settlement "reduces the claim of the releasor against the other tortfeasors to the extent of any amount stipulated by the release or the covenant . . . or in the amount of the released tortfeasor's equitable share of the damages . . . whichever is greater." The statute "applies to joint tortfeasors . . . and even intentional tortfeasors." *Roma,* 103 A.D.2d at 608, 481 N.Y.S.2d at 813.

■ The availability of setoff to non-settling defendants under Section § 1983 presents an unsettled and significantly more difficult question. 1 MARTIN A. SCHWARTZ & JOHN E. KIRKLIN, SECTION 1983 LITIGATION § 16.18, at 895, 897 (2d ed. 1991).

Section 1983 is silent on setoff, necessitating reference to 42 U.S.C. § 1988, which provides courts with "some modest guidance for resolving the choice of law question in civil rights cases." *Miller v. Apartments and Homes of New Jersey, Inc.,* 646 F.2d 101 (3d Cir.1981). Section 1988 states, in relevant part, that the federal courts' jurisdiction over Section 1983:

> "shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction [is located] . . ., so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause. . . ."

Section 1988 therefore requires courts first to determine whether "suitable" federal law exists. If it does not, the relevant state law must be compared with principles underlying Sections 1983 and 1988. "If there is no inconsistency between these two bodies of law, the state law solution to the problem will be applied. If there is an inconsistency, the state law must be rejected, and this court must fashion an appropriate remedy to carry out the congressional purposes behind the civil rights legislation." *Goad v. Macon County, Tennessee,* 730 F.Supp. 1425, 1426 (M.D.Tenn.1989).

■ While it is apparent that the civil rights laws do not address the setoff issue, the phrase "the laws of the United States" includes federal common law. *See Gray v. City of Kansas City, Kan.,* 603 F.Supp. 872, 875 (D.Kan.1985). However, the few federal common law pronouncements concerning setoff under Section 1983 are inconsistent. *Compare Miller,* 646 F.2d at 110 ("where one or more defendants have settled with a plaintiff, the damages recoverable by that plaintiff shall be reduced by the amount of the settlement received"), *with Dobson v. Camden,* 705 F.2d 759, 768 (5th Cir.1983), *rev'd on other grounds,* 725 F.2d 1003 (5th Cir.1984) ("A settlement by one tortfeasor . . . should have no effect on the liability of another tortfeasor.").[9] A number of courts have determined that "federal law is deficient on the effect of a settlement with a joint tortfeasor on the liability of a nonsettling tortfeasor." *Id.* at 763. *See Johnson v. Rogers,* 621 F.2d 300, 304 n. 6 (8th Cir.1980); *Hoffman v. McNamara,* 688 F.Supp. 830, 833 (D.Conn.1988). Thus, the Court concludes that the availability of setoff under Section 1983 requires consideration of state law and its consistency with the federal policies underlying Section 1983.

"The policies underlying § 1983 include compensation of persons injured by deprivation of federal rights and prevention of abuses of power by those acting under color of state law." *Robertson v. Wegmann,* 436 U.S. 584, 590–91, 98 S.Ct. 1991, 1995, 56 L.Ed.2d 554 (1978). The Fifth Circuit offers a succinct paraphrase: "[S]ection 1983 embodies

---

9. In *Miller,* 646 F.2d at 105–08, the Third Circuit simply developed a federal common law solution to the contribution issue. Other courts considering the issue have adhered more closely to the language of Section 1988. As the Fifth Circuit explained, "section 1988 would make no sense if *Miller* were correct on that point." *Dobson,* 705 F.2d at 763.

two policies: compensation and deterrence." *Dobson*, 705 F.2d at 763. The question therefore is whether allowing setoff in accordance with state law would tend to defeat these policies.

Section 15–108 of the General Obligations Law, insofar as it is relevant here, permits a non-settling defendant to setoff the greater of (a) the amount of any settlement actually paid by a settling defendant, or (b) the settling defendant's equitable share of the damages. Thus, if the settling defendant pays a settlement higher than its equitable share, the sum of the reduced damages paid by the non-settling defendant and the settlement will equal the total amount of damages sustained. But if the plaintiff makes a disadvantageous settlement—that is, if the plaintiff settles with one tortfeasor for less than that tortfeasor's equitable share of the damages—the sum of the plaintiff's judgment against the non-settling defendant, net of the reduction compelled by Section 15–108, and the settlement will be less than the total amount of damages inflicted by the joint tortfeasors.

Here, the total damages sustained did not exceed $210,000. The City paid a settlement of $145,000. The jury found that the NYPD told Melendez that he had the wrong person. While the City nevertheless bears some responsibility for what followed because the NYPD did not require that Mason be freed on the spot and allowed Melendez to leave Central Booking with on-line booking documents that may have cloaked him with a color of authority for his custody of Mason, the Court finds that the City's equitable share of the responsibility pales by comparison with that of Melendez, who was a deliberate wrongdoer. Accordingly, the Court finds that the settlement paid by the City comfortably exceeded its equitable share of the damages.

In these circumstances, reduction of the defendants' liability by the amount of the City's settlement would not conflict with either of the policies underlying Sections 1983 and 1988. Mason still would be made whole in that the sum of the defendants' liability in this case and the City's settlement would equal the sum of the damages found by the jury for the first and third periods of deten-

tion and the maximum amount for the second period that is legally justifiable. The question whether Section 15–108 may be applied in a Section 1983 case where the amount of the settlement is less than the settling defendant's equitable share of the damages—and the effect of the setoff would be to leave the plaintiff less than whole—will be left for another day.

■ The next question is the proper allocation of the settlement paid by the City to the different time periods at issue. The jury found aggregate liability of $300,000 of which $50,000 was attributed to the time prior to the arrival at the Port Authority facility, $100,000 to the time spent in the custody of the Port Authority, and $150,000 to the remaining time in the bondsmen's custody. The Court, however, has held that any damages for the second period in excess of $10,000 would be excessive. Hence, the aggregate liability for compensatory damages cannot exceed $210,000, of which roughly 24% ($50,000/$210,000), or $34,524, is attributable to the pre-Port Authority period, 4.8% ($10,000/$210,000), or $6,905, is attributable to the period while Mason was at the Port Authority facility, and approximately 71% ($150,000/$210,000), or $103,571, to the ensuing period.

■ BBA and CI are jointly and severally liable for the entirety of plaintiff's compensatory damages, net of the City settlement. Assuming the plaintiff agrees to a remittitur, this sum is $65,000, which represents the total amount of damages to which plaintiff is entitled, $210,000, minus the City's settlement of $145,000. The Port Authority defendants were not responsible for any damages incurred prior to plaintiff's arrival at its facility. Accordingly, they are jointly and severally liable only for those damages incurred in the second and third periods, which, assuming the remittitur is accepted, are $160,000 minus the City's proportionate settlement setoff of $110,476, or $49,524.

### Contribution/Apportionment of Liability

■ The Port Authority officers and the Port Authority, joined by BBA and CI, request that the Court apportion liability

among the defendants. In making this claim, however, the officers overlook the fact that their liability stems from federal law, namely Section 1983, as well as state law. Although "courts have struggled with [the right to contribution under § 1983] and have reached different conclusions," *Harris v. Angelina County,* 31 F.3d 331, 338 & n. 9 (5th Cir.1994), the Court determines that there is no right to contribution under Section 1983.[10]

As previously discussed, Section 1988 authorizes courts to import state law to fill in gaps in the civil rights laws. Whether the availability of contribution even merits application of the Section 1988 test is a threshold issue that is the subject of some debate.

In *Moor v. County of Alameda,* 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973), the Supreme Court stated that Section 1988 was not intended "to authorize the wholesale importation into federal law of state causes of action...." *Id.* at 703–04, 93 S.Ct. at 1793. Some courts have interpreted this language as settling the issue. *E.g., Rosado v. New York City Housing Authority,* 719 F.Supp. 268, 273 (S.D.N.Y.1989) ("42 U.S.C. § 1988 serves the purpose of vindicating rights under § 1983, not state laws of contribution."); *see* 1 SCHWARTZ & KIRKLIN, SECTION 1983 LITIGATION § 16.18, at 89 (*Moor* "would seem to preclude the utilization of § 1988 as a basis for finding a state law right of contribution in § 1983 actions.").

On the other hand, *Moor* cites *Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969), for the proposition that " 'the existence of a statutory right implies the existence of all necessary and appropriate remedies....' " When construing Section 1988, " 'both federal and state rules on damages may be utilized, whichever better serves the policies expressed in the federal statutes.' " *Moor,* 411 U.S. at 703, 93 S.Ct. at 1792 (quoting *Sullivan,* 396 U.S. at 240, 90 S.Ct. at 406). Thus, the Port Authority argues, an action for contribution does not fall under *Moor's* "wholesale importation" language. Indeed, some courts have permitted contribution under Section 1983. *See Alexander v. Hargrove,* No. 93 Civ. 5510, 1994 WL 444732, at *1 (E.D.Pa. Aug. 16, 1994); *Fishman v. De Meo,* 604 F.Supp. 873, 877 (E.D.Pa.1985). Because the propriety of Section 1988's application to the issue of contribution under Section 1983 remains something of an open question, the Court applies the Section 1988 test.

As the above authorities make clear, federal law does not establish a right to contribution under Section 1983. *See* 1 SCHWARTZ & KIRKLIN, SECTION 1983 LITIGATION, § 16.18, at 895. New York law clearly permits a tortfeasor to seek contribution from other nonsettling defendants. NEW YORK CIVIL PRACTICE LAW AND RULES § 1401 (McKinney, 1995). The question thus reduces to whether contribution between joint tortfeasors is consistent with Section 1983's goals.

As stated above, the primary ends of Section 1983 are deterrence and compensation. The availability of contribution does not affect a plaintiff's right to receive compensation but is simply a matter of who pays for the harm to the plaintiff. Permitting a right to contribution, however, would weaken Section 1983's deterrent value. Accordingly, contribution among joint tortfeasors in Section 1983 cases would conflict impermissibly with the statutory goal of deterrence and is impermissible under the third prong of the Section 1988 test.[11]

---

**10.** The Supreme Court rejected the availability of contribution under Title VII civil rights claims in *Northwest Airlines v. Transport Workers Union,* 451 U.S. 77, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981). The decision was based in substantial part upon the specific statutory framework of Title VII instead of the Section 1988 test. *Id.* at 94, 101 S.Ct. at 1582. The Supreme Court's reluctance to recognize a right to contribution in civil rights cases is, nonetheless, instructive.

More recently, the Supreme Court has suggested that the argument against contribution "under an express remedial provision fashioned by Con-

gress" has "much force." *Musick, Peeler & Garrett v. Employers Ins.,* 508 U.S. 286, 113 S.Ct. 2085, 124 L.Ed.2d 194 (1993). Although the opinion did recognize a right of contribution under a judicially-fashioned provision of the securities laws, Section 1983 is certainly a remedy fashioned by Congress.

**11.** The Court notes that the Port Authority and BBA and CI are both liable exclusively under New York law. However, their vicarious liability derives from the actions of agents—the officers and Melendez, respectively—who are liable un-

*Conclusion*

For the foregoing reasons, a new trial is ordered with respect to (a) plaintiff's punitive damage claims against BBA and CI and, unless plaintiff files a notice with the Clerk of the Court on or before January 10, 1997 accepting the remittitur, (b) the amount of plaintiff's damages for the period during which she was held at the Port Authority facility at John F. Kennedy International Airport. Should plaintiff accept the remittitur, judgment ultimately shall be entered in plaintiff's favor (a) against defendants BBA, CI, the Port Authority, Hassett, Kohlman and Schaeffer, jointly and severally, for the sum of $49,524, and (b) against defendants BBA and CI, jointly and severally, in the additional amount of $15,476, the foregoing constituting the plaintiff's compensatory damage recovery. Entry of judgment will be delayed pending the disposition of plaintiff's punitive damage claim against BBA and CI.

SO ORDERED.

der Section 1983. Allowing the Port Authority and BBA and CI, whose agents were the primary tortfeasors against Mason, to seek contribution would circumvent entirely the deterrent aim of Section 1983, as explained below.